**BENDER SHIPBUILDING & REPAIR CO., INC., Plaintiff,**

v.

**THE VESSEL DRIVE OCEAN V, Official No. 24542–PEXT, in rem; Drive Panama, S.A., and Drive Ocean Group, in personam, Defendants.**

**And Related Actions**

**No. 97–0699 JM(AJB).**

United States District Court, S.D. California.

Sept. 29, 1998.

Michael L. Armitage, Keesal Young and Logan, Long Beach, CA, for Bender Shipbuilding & Repair Co., Inc.

Robert J. Zapf, Hancock Rothert and Bunshoft, Los Angeles, CA, for Nordlandsbanken ASA.

William D. Evans, Moore Rutter and Evans, Long Beach, CA, for Marlo Intern., Inc.

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR PARTIAL SUMMARY JUDGMENT; PRIORITIZING THE CLAIMANTS' IN REM CLAIMS; GRANTING BENDER SHIPBUILDING'S MOTION FOR DEFAULT JUDGMENT AGAINST IN PERSONAM DEFENDANTS; SCHEDULING ORDER

MILLER, District Judge.

The present motion concerns the validity and priority of competing claims to approximately $1.5 million deposited with the Registry of the Court ("Fund") as a result of the judicially ordered interlocutory sale of the vessel M/V DRIVE OCEAN V ("Vessel"). Each of the moving parties claims first priority to the Fund: Nordlandsbanken ASA ("Bank"), Bender Shipbuilding & Repair Co., Inc. ("Bender"), Odin Shipping Ltd. ("Odin"), and Marlo International Incorporated ("Marlo"). For the reasons set forth below, the court grants in part and denies in part the parties' motions for partial summary judgment; prioritizes the *in rem* claims of the parties, and grants Bender's motion for default judgment against the *in personam* defendants. Further, the court sets a hearing date of November 23, 1998, at 10:30 a.m. to determine the amount of the claims.

## BACKGROUND

At various times, the parties to this consolidated admiralty action either commenced separate actions or intervened in the present actions to assert *in rem* claims against the Vessel and *in personam* claims against Drive Panama, S.A., Drive Ocean Group, and Drive Mexicana, S.A. (collectively "Drive Ocean"). The following sets forth the basis for each claim.

*Bender's Claim*

On August 15, 1995, Bender and Drive Ocean Group entered into a Memorandum of Agreement ("MOA") whereby Bender agreed to sell the Vessel for $1,135,000.

Pursuant to a Novation Agreement dated September 22, 1995, · Drive Ocean Group assigned all of its rights and obligations under the MOA to a subsidiary, Drive Panama, S.A.. Also on September 22, 1995, Drive Panama, S.A. executed a Promissory Note ("Note") in favor of Bender in the amount of $235,000, plus interest at the rate of ten percent per annum until paid, with a maturity date of October 22, 1996. The Note reflected the balance of the purchase price owed by Drive Panama to Bender because the principal amount of the purchase price, $900,-000, was funded with a loan by Bank and guaranteed with a first preferred ship mortgage. In the event of default, the note limited Bender's attorneys fees to 20% of the amount due and unpaid.

In order to secure payment of the Note, on September 22, 1995, Drive Panama, S.A. executed a second naval mortgage. The second mortgage complied with Panamanian law and was duly recorded. Upon default on the Note, Bender commenced the present action on April 16, 1997, and caused the Vessel to be arrested on the same day.

Bender concedes that Bank's principal claim of $950,000 plus interest takes legal and contractual precedence over Bender's second naval mortgage. Notwithstanding, Bender contends that Bank's attorneys fees of approximately $350,000 are not entitled to priority over its second naval mortgage. Bender also contends that the liens of Marlo and Odin are junior to the ship mortgages.

Finally, Bender seeks to establish an *in rem* claim against the Vessel in the amount of $390,091.82 (constituting $316,316.24 in principal and interest plus $63,263.37, or 20% of the outstanding principal and interest, in attorneys fees plus $10,517.61 in costs) and *in personam* judgment against Drive Panama and Drive

Ocean Group in the amount of $455,902.11 (the difference between the two claims is due to the contractual limitations on attorney's fees).

*Bank's Claims*

On August 25, 1995, the Bank agreed to loan Drive Panama $950,000 for the purchase of the Vessel from Bender. On September 22, 1995, Drive Panama executed a first naval mortgage which was duly and properly recorded in the Panamanian Registry of Ships on or about October 23, 1995. Following Drive Panama's default on the note, on July 11, 1997, Bank intervened in the earlier filed Bender action to foreclose on its first preferred ship mortgage.

*Odin's Claims*

On December 5, 1996, Odin and Drive Mexicana entered into a charter agreement for the Vessel.[1] The charter party contemplated an initial period of 15 months with an option to renew. The time charter was for the specific purpose of towage of an oceangoing barge between the ports of Manzanillo, El Sauzal, and the west coast of North and Central American. Among other things, the parties agreed that the "Charter Party shall be governed by and construed in accordance with the laws of the Province of British Columbia." (Odin's Second Verified Complaint, Exh. A., clause 44(a)).

On April 30, 1997, Odin filed its own action against Drive Panama, Drive Mexicana, Drive Ocean Group and the Vessel for the alleged breach of a charter party and alleged tortious conduct in connection with the charter party. Specifically, Odin alleges that Drive Ocean represented on April 15, 1997, that it intended to direct the Vessel to San Diego to refuel the tug, as was contemplated by and permitted under the charter. Odin, having heard ru-

---

1. To clarify the relationship amongst the Drive Group defendants, Drive Panama is the owner of Vessel who entered into a bare-boat agreement with Drive Mexicana. Drive Mexicana, in turn, entered into a time charter agreement with Odin, incorporated in the Barbados. Odin is a subsidiary of Viking Carriers S.A. of Mexico who used the Vessel for the purpose of towing the cement barge "Ash Grove Trader" on the west coast of Central and North America.

mors of unpaid claims against the Vessel, requested assurances that there were no unpaid creditors who could arrest the Vessel upon arrival in San Diego. The Vessel's principal, Rolv Berg, represented that there was no situation which would present a risk of an arrest in San Diego. The following day, on April 16, 1997, the Vessel was arrested in San Diego.

Pursuant to the time charter, Drive was also obligated to deliver the vessel in a seaworthy condition with at least 100 metric tons of fuel on board. Drive failed to comply with this condition. On December 13, 1996, and again on April 14, 1997, Odin prepaid a total of 39 days of charter hire at a rate of $3,400 per day. The delivery of the vessel was 78 days late which caused Odin to incur daily hire costs of 20.99 days at $3,735 per day for the barge. The complaint also alleges that the negligent operation of the vessel caused propeller and tow wire damage which resulted in additional down time of the vessel and that Odin paid for certain amounts of bunker fuel which were unaccounted for by Drive. Further, the complaint alleges that Drive made a series of misrepresentations regarding the financial seaworthiness of Vessel and failed to comply with the terms and conditions of the charter contract.

On July 8, 1998, this court granted entry of default judgment against the *in personam* defendants but denied Odin's motion for *in rem* default judgment.

*Marlo's Claims*

Marlo's claims arise from provisions and services supplied to the Vessel. The first component of its claim is for $95,256.22 and arises from services provided to the Vessel while in Bender's repair yard from August 18, 1995, until November 30, 1995. In furnishing these provisions, Marlo acted under the authority of the MOA, entered into between Bender and Drive Ocean Group. The second component of its claim is for $166,5000 and arises from the sale of a winch on December 12, 1996. The winch was furnished to the Vessel in Mexico, and not the United States.

On September 27, 1997, Marlo intervened in the Bender Action. By the present motion, Marlo seeks a determination that its liens are superior to those of the other claimants.

## DISCUSSION

### A. Legal Standards

A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir.1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the file which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). The opposing party cannot rest on the mere allegations or denials of a pleading, but must "go beyond the pleadings and by [the party's] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553 (citation omitted). The opposing party also may not rely solely on conclusory allegations unsupported by factual data. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989).

The court must examine the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Any doubt as to the existence of any issue of material fact requires denial of the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On a motion for summary judgment, when " 'the *moving party* bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial.' " *Houghton v. South,* 965 F.2d 1532, 1536 (9th Cir.1992) (emphasis in original) (quoting *International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1264–65 (5th Cir.1991), *cert. denied,* 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992)).

### B. Analysis

The Ship Mortgage Act sets forth the rules for prioritizing maritime liens and ship mortgages. 46 U.S.C. §§ 31301–43. Following the sale of a vessel by court order, the vessel is sold free of all claims but the

claims terminated under subsection (a) of this section attaches to the proceeds of the sale, except that—

(1) the preferred mortgage lien … has priority over all claims against the vessel (except for expenses and fees allowed by the court, costs imposed by the court, and preferred maritime liens); and

(2) for a foreign vessel whose mortgage has not been guaranteed under title XI of that Act, the preferred mortgage lien is subordinate to a maritime lien for necessaries provided in the United States.

46 U.S.C. § 31326. In pertinent part, a "preferred mortgage" means a mortgage

that is established as security on a foreign vessel if the mortgage, hypothecation, or similar charge was executed under the laws of the foreign country under whose laws the ownership of the vessel is documented and has been registered under those laws in a public register at the port or registry of the vessel or at a central office.

46 U.S.C. § 31301(6)(B). Here, no party disputes that Bank and Bender have preferred first and second maritime mortgages, respectively.

The parties dispute whether Odin and Marlo have preferred maritime liens. The ship mortgage defines "preferred maritime lien" to include "damages arising out of maritime tort." 46 U.S.C. § 31301(5)(B). With these legal principles in mind, the court turns to the claimed preferred maritime liens.

### 1. Marlo's Claims

Marlo claims priority for provisions to the Vessel. The first component of Marlo's claims is for the provision of services and supplies rendered to the Vessel in Mobile, Alabama from August 18, 1995, through November 30, 1995. Under the Ship Mortgage Act, a person supplying necessaries to a vessel has a preferred maritime lien if the necessaries are supplied in the United States to a foreign-flagged vessel, 46 U.S.C. § 31326(b)(2), provided that the necessaries are ordered by the owner, or authorized representative, of the vessel. *See Port of Portland v. M/V Paralla,* 892 F.2d 825, 827 (9th Cir. 1989). A person

providing necessaries to a vessel on the order of the owner or a person authorized by the owner—

(1) has a maritime lien on the vessel;

(2) may bring a civil action in rem to enforce the lien; and

(3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342(a). The Ship Mortgage Act also defines those persons presumed to have authority to procure necessaries:

(a) The following persons are presumed to have authority to procure necessaries for a vessel:

(1) the owner;

(2) the master;

(3) a person entrusted with the management of the vessel at the port of supply; or

(4) an officer or agent appointed by—

(A) the owner;

(B) a charterer;

(C) an owner pro hac vice; or

(D) an agreed buyer in possession of the vessel.

46 U.S.C. § 31341(a).

The issue before the court is whether or not Drive Ocean had the requisite authority within the meaning of the Ship Mortgage Act as "an agreed buyer in possession" so as to give Marlo a preferred maritime lien on the Vessel. Marlo presents undisputed evidence that Drive Ocean Group hired Larry Aycock to act as its on-site superintendent and to approve and supervise the provision of services, supplies, and other necessaries to the Vessel. In addition, Larry Aycock was to ensure that Bender met its obligations under the purchase and sale agreement regarding the condition of the Vessel as it was to be delivered under the terms of the MOA. (Decl. of Larry Aycock, ¶¶ 4–7). Further, the August 15, 1995, MOA specifically provided that Drive Ocean's superintendent (Larry Aycock) would have "full access" to the vessel while at Bender's yard. (Marlo's Brief, Exh. C, ¶ 21). During this period of time, Larry Aycock acted in his capacity as an agent for an agreed buyer in possession by supervising the work as well as ordering additional services, supplies, labor, and provisions to be provided to the Vessel by various vendors, including Bender and Marlo. Some of these latter provisions went beyond the scope of the work as the Vessel was to be sold under the terms of the MOA.

■ In looking to the totality of the circumstances, the necessaries provided by Marlo were ordered by a person with authority to bind the Vessel. As noted in *Marine Coatings of Alabama, Inc. v. United States*, 932 F.2d 1370, 1376 (11th Cir. 1991), "authorization, either actual or fairly presumed, given prior to or during performance of the services, or ratified subsequent to the performance will suffice (to

bind the lien to the vessel)." Here, Marlo has a valid preferred maritime lien for necessaries provided after August 15, 1995, the effective date of the MOA.

The other lien claimants contend that Marlo does not possess a maritime lien for the supply of necessaries for the period of August 15, 1995 through September 22, 1995, because passage of title to the Vessel did not occur until September 22, 1995, and because Ocean Group did not exercise "some form of actual physical control over a vessel to attain the status of an 'agreed purchaser in possession.'" *Intern. Seafoods of Alaska v. Park Ventures, Inc.*, 829 F.2d 751, 755 (9th Cir.1987). These contentions fail to raise a genuine issue of material fact. The undisputed facts establish that Ocean Group exercised key attributes of "ownership" over the Vessel. Ocean Group had unimpeded access to the Vessel during normal working hours, supervised refurbishment of the Vessel, and, significantly, ordered work following outside the scope of the contract between Bender and Ocean Group. These facts are consistent with the activities of an agreed purchaser in possession. In the absence of disputed facts, Ocean Group's conduct satisfies the agreed owner in possession requirement of § 31341(a)(4)(D).

Finally, Bank contends that Marlo is precluded from asserting a maritime lien against Vessel because, among other things, the MOA prohibited attachment of liens before the delivery date of Vessel. This argument is unavailing because the contractual duty to prevent liens from attaching to Vessel lies with Bender, and not Marlo. As such, Marlo has a preferred maritime lien for the provision of necessaries to Vessel from August 15, 1995 through November 30, 1995.[2]

■ The second component of Marlo's claim is for the sum of $166,500 for the supply of a winch to Vessel in Mexico. Because the Ship Mortgage Act provides

---

**2.** The parties also dispute the amount of Marlo's maritime lien of $95,256.22. The court does not reach this issue as the amount of the

parties' liens will be decided at a future hearing date as set forth herein.

that only necessaries furnished in the United States obtain priority status, 46 U.S.C. § 31326(b)(2), this component of Marlo's claim must fail. At the time of oral argument, Marlo conceded that its claim for the winch is not a preferred maritime lien. The court further observes that Marlo fails to establish that equitable subordination principles should apply to elevate its claim. As such, Marlo is not entitled to priority for the supply of the winch.

### 2. Odin's Claim

■ The threshold issue presented by Odin concerns the contractual choice of law provision. Odin and Drive Group agreed that any dispute "arising out of or in connection with" the charter party would be resolved by arbitration in Vancouver, B.C. through the application of laws of the Province of British Columbia. (Odin Compl., Exh. A at 20). "There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, such as that involved here, should be given full effect." *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 12–13, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). In apparent recognition that British Columbian law would not recognize a maritime lien under the facts alleged in its complaint, (Tetley Decl.), Odin argues that the misrepresentation whereby Odin was induced to bring the Vessel to San Diego is an independent tort not subject to either the choice of law or forum selection provision. This argument is unavailing. Forum selection and choice of law provisions are presumed valid and will be enforced unless it clearly would be "unreasonable and unjust", or the clause was invalid for such reasons as fraud or overreaching. *The Bremen*, 407 U.S. at 15, 92 S.Ct. 1907. Here, Odin fails to make a showing that application of the contract provisions are unreasonable or in any way unjust.

■■ Having determined that the contractual choice of law and forum selection provisions are valid and that Canadian law would not recognize a maritime lien for the seizure of the Vessel while in San Diego, the next issue is whether the alleged torts fall within the scope of the contractual provisions. Whether the contractual provisions apply to tort claims depends on whether resolution of the claims relates to interpretation of the contract. *Manetti– Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 514 (9th Cir.1988). In *Manetti– Farrow*, the contract provided that any controversy "regarding interpretation or fulfillment" of the contract must be litigated in Florence, Italy. The Ninth Circuit held that the various tort claims (e.g. breach of implied covenant of good faith, interference with economic advantage, etc.) related to the rights and duties under the contract because the claims could not "be adjudicated without analyzing whether the parties were in compliance with the contract." *Id.* at 514. Here, the contract provides that "all disputes arising out of or in connection with" the charter party shall be resolved in Vancouver B.C. and "shall be governed by and construed in accordance with the laws of the Province of British Columbia." (Odin's Compl., Exh. A at 20). Odin's claims relate to the financial seaworthiness of the Vessel, the obligation to provide 100 metric tons of fuel, breach of the charter party, misrepresentation, conversion of the fuel oil, and negligent operation of the Vessel. Each of these claims relates in some way to the rights and duties set forth in the charter party and each arises "in connection" with the charter party. Further, the tort causes of action are inextricably entwined with the contractual claims in the sense that consideration of the alleged torts necessarily requires consideration of the contract. As such, Odin's claims fall within the scope of the choice of law and forum selection provisions.

Odin also argues that United States law should apply to the alleged torts under the analysis set forth in *Lauritzen Rhoditis, and Romero v. International Terminal Operating Co.*, 358 U.S. 354, 383–92, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). In *Rome-*

*ro* the Supreme Court enumerated a number of factors to be considered by courts in evaluating whether a plaintiff may sue under the Jones Act despite the existence of a choice of law provision in an employment contract. The enumerated factors include (1) the place of the wrongful act; (2) the law of the flag; (3) the allegiance or domicile of the injured plaintiff; (4) the allegiance of the defendant; (5) the place of the contract; (6) the inaccessibility of a foreign forum; and (7) the law of the forum. *Id.* In *Romero,* and its progeny, the claims asserted implicated strong United States policy interests as set forth in the Jones Act. Here, by contrast, the same strong policy interests do not exist because the underlying contract was entered into by sophisticated business persons who, unlike an ordinary seaman, fully understood the ramifications of the choice of law provision. Further, the court observes that the strong interests of the United States in ensuring the free flow of international maritime commerce is best served by enforcing the parties' agreement. Finally, the court observes that both Canada and Mexico have more substantial interests in Odin's claims than the United States because the wrongful acts generally occurred in both Mexico and the United States; the law of the vessel's flag is Mexico; Odin's allegiance is either to the Barbados (its state of incorporation) or Mexico where its operations are located; the shipowner, Drive Mexicana, owes its allegiance to Mexico where its operations are based; the place of the contract involves the United States, Mexico, Norway, and Canada; the parties chose Canadian law to govern the contract; and there is no showing that other forums are unavailable to Odin.

In sum, under the choice of law provision Odin is not entitled to a preferred maritime lien superior to the ship mortgages.

*3.* *Bender's Motion for Default Judgment*

 Federal Rule of Civil Procedure 55(b) provides, in pertinent part, that after entry of default, "the party entitled to a judgment by default, shall apply to the court therefor." Ordinarily, the default itself established the defendant's liability. "Upon default, the well-pleaded allegations of the complaint relating to liability are taken as true," but not allegations as to the amount of damages. *Dundee Cement Co. v. Howard Pipe & Concrete Products,* 722 F.2d 1319, 1323 (7th Cir.1983); *TeleVideo Systems Inc. v. Heidenthal,* 826 F.2d 915, 917 (9th Cir.1987). The amount of damages may be determined from the allegations of the complaint although those allegations are not controlling. *Dundee,* 722 F.2d. at 1323–24. Where plaintiff is entitled to reasonable attorney's fees by either contract or statute, the court will determine the amount to be awarded. *James v. Frame,* 6 F.3d 307, 311 (5th Cir.1993). The granting or denying of a default judgment is within the court's sound discretion. *Draper v. Coombs,* 792 F.2d 915 (9th Cir.1986).

Here, the complaint's allegations as well as the declarations and exhibits filed herein establish Drive Panama and Drive Ocean Group's liability under the preferred ship mortgage. The only remaining issue concerns the amount of damages. The declaration of Bender's Treasurer, David Barnett, establishes that Drive Panama failed to make any payments in accordance with the terms of the note and preferred ship mortgage. As such, Bender is entitled to the unpaid principal on the note, accrued interest, and legal fees and costs. Accordingly, the court grants default judgment *in personam* against Drive Panama and Drive Ocean Group in the amount of $390,091.82.[3]

---

**3.** The court rejects Bender's contention that it is entitled to 100% of its attorney fees and costs. The measure of damages is set forth in the loan documents and specifically limits Bender's fees and costs to 20% of the outstanding balance and accrued interest.

## CONCLUSION

Having carefully considered the matter presented, the record before the court, the oral arguments of counsel, and the applicable authority the court finds that there is no genuine issue of material fact or law regarding the following priorities:

First priority: Marlo's claims for the supply of necessaries for the period of August 15 through November 30, 1995;

Second priority: Bank's first preferred ship mortgage;

Third priority: Bender's second preferred ship mortgage;

Fourth priority: Odin's claims and Marlo's claim for the winch.

Each of these claims is junior to the payment of administrative expenses. Further, the court enters default judgment against Drive Panama on Bender's claims in the amount of $390,091.82.

Finally, because there is a dispute regarding the amount of the parties' claims, the court sets a hearing of November 23, 1998 at 10:30 a.m. to determine the amount of the parties' claims. The parties are instructed to follow the briefing schedule set forth in the Local Rules. Further, where a party seeks to recover its attorneys' fees and costs, such fees and costs must be reasonably documented. The pretrial conference and trial dates are hereby vacated.

**IT IS SO ORDERED.**