[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

----------------------------------------
### No. 98-4922
----------------------------------------

D. C. Docket No. 97-CV-1229-JLK

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
08/09/99
THOMAS K. KAHN
CLERK

GALEHEAD, INC., an Oregon Corporation,

Plaintiff-Appellant,
Cross-Appellee,

versus

M/V ANGLIA, in rem,

Defendant-Appellee,
Cross-Appellant.

----------------------------------------------------------------
### Appeals from the United States District Court
### for the Southern District of Florida
----------------------------------------------------------------
**(August 9, 1999 )**

Before EDMONDSON and MARCUS, Circuit Judges, and ALARCON*, Senior Circuit Judge.

_____

*       Honorable Arthur L. Alarcon, Senior United States Circuit Judge for the Ninth Circuit, sitting by designation.

PER CURIAM:

This case is about maritime liens. The district court said, on cross motions for summary judgment, that the plaintiff Galehead, Inc. ("Galehead") was entitled to only one of the three maritime liens it was seeking. We affirm that determination but conclude the value of that lien

should be $24,376.00 and not--as the district court said--$20,349.29.

## Background

This case is an in rem admiralty action about the efforts of the M/V Anglia ("Anglia") to procure fuel by means of its charterer Genesis Container Line ("Genesis"). Anglia was fueled on three separate occasions.

On 25 August 1995, Genesis contacted Polygon Energy Services, Inc. ("Polygon") to obtain fuel bunkers for Anglia at Port Everglades, Florida. Polygon then contacted Establissment Asamar, Ltd. ("Asamar"), to supply the fuel. Asamar engaged Coastal Refining and Marketing, Inc. ("Coastal"), who physically fueled Anglia on 26 August 1995. The bunker confirmation prepared by Polygon listed Coastal as the physical supplier and Asamar as the seller. The cost of the bunkers was paid by Asamar to Coastal. Genesis failed to pay Asamar for the bunkers, however.

The second fueling occurred on 8 September 1995, when Genesis again engaged Polygon to obtain bunkers for Anglia in Houston, Texas. Polygon then contacted Asamar who contacted ChemOil Corp. ("ChemOil") and Marsh Distributing Company ("Marsh") with instructions to fuel Anglia. ChemOil and Marsh supplied the fuel on 11 September 1995. Asamar paid ChemOil and Marsh for the bunkers but was not reimbursed by Genesis. In

2

November, Asamar assigned its rights to the money from both of these fuelings to the collection agency, Galehead.

The third fueling incident was different. On 27 October 1995, Genesis contacted Polygon to procure bunkers for Anglia in Houston, Texas. Polygon then engaged ChemOil and Tesoro Petroleum Distributing Company ("Tesoro") to fuel Anglia. The bunker confirmation prepared by Polygon listed ChemOil and Tesoro as the "physical suppliers" and Polygon as the "seller." Polygon paid ChemOil and Tesoro $20,349.29 for supplying the fuel, but Genesis failed to pay Polygon the $24,376.00 it owed under the contract with Polygon. In December 1995, Polygon assigned its rights under the contract with Genesis to Galehead.

On 24 April 1997, Galehead filed a complaint to enforce the full amount of the three liens against Anglia. Both parties moved for summary judgment. The district court granted each motion in part. Applying a seven-part test of its own creation, the district court determined that Polygon had a maritime lien against Anglia but that Asamar did not have one. The court therefore ordered judgment for Galehead in the amount of Polygon's lien: the contract price of $24,376.00. The court later reduced the amount, though, to what Polygon had paid ChemOil for the fuel in question: $20,349.20. Galehead

3

appealed and Anglia cross-appealed.[1]

## Discussion

The test for determining who is entitled to a maritime lien must come from a plain reading of the statute itself:

> (a) Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner--
> > (1) has a maritime lien on the vessel;
> > (2) may bring a civil action in rem to enforce the lien; and
> > (3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342. Therefore, to obtain a maritime lien, a person must: (1) provide necessaries; (2) to a vessel; (3) on the order of the owner or agent. While Polygon satisfies all three of the elements, Asamar fails on element number three and does not qualify for its two liens. So, Galehead is entitled to only one lien.

### A. Polygon

About the first element, although Polygon did not physically supply the bunkers, a party need not be the physical supplier or deliverer to have

---

[1]As part of its cross-appeal maintaining that summary judgment should not have been granted to Galehead on Polygon's claim, Anglia makes two arguments. First, Anglia argues that its fact-based affirmative defenses were not susceptible to summary judgment. Second, Anglia argues that Galehead has failed to perfect proper assignments. Anglia, however, has presented no triable issue of fact on either of these claims.

"provided" necessaries under the statute. See The Golden Gate Knutsen v. Associated Oil Co., 52 F.2d 397, 400 (9th Cir. 1931); A/S Dan-Bunkering LTD. v. M/V Zamet, 945 F. Supp. 1576, 1578-79 (S.D. Ga. 1996). The bunkers were supplied pursuant to an agreement made between Genesis and Polygon. That agreement caused, or provided for, the delivery of the fuel to the vessel. Therefore, Polygon "provided" necessaries to the vessel under the contract irrespective of how, or by whom, the delivery was carried out. See generally Restatement (Second) of Contracts § 318 cmt. a, illus. 2 (1979) ("A contracts to deliver to B coal of specified kind and quality. A delegates the performance of this duty to C, who tenders to B coal of the specified kind and quality. The tender has the effect of a tender by A.").

The second and third elements of the statute are also satisfied. On element number two, no one disputes that the bunkers were supplied to the vessel. About element number three, the contract was performed on the order of the charterer Genesis. A charterer is authorized under the statute to bind a vessel for necessaries. See 46 U.S.C. § 31341(a)(4)(B); see also Trico Marine Operators, Inc. v. Falcon Drilling Co., 116 F.3d 159, 161-62 (5th Cir. 1997).

B. Asamar

The work done by Asamar was not "on the order of the owner or a

5

person authorized by the owner."  Therefore, Galehead is entitled to neither of the two potential liens arising from the August and September 1995 fuelings.  Summary judgment was proper for Anglia here.

That Asamar has met the first two elements of the statutory test is not much disputed.  But the third element is a problem for Asamar.  Asamar did not provide the bunkers on order of the owner or an authorized agent.  Asamar provided the bunkers at Polygon's request, and Polygon is not a "person[] . . . presumed to have authority to procure necessaries[.]"  46 U.S.C. § 31341(a); see also Port of Portland v. M/V Paralla, 892 F.2d 825, 828 (9th Cir. 1989) (stating the general rule that general contractors have no authority to bind a vessel).[2]  In the circumstances of this case, therefore, the only way Asamar could have performed work on the order of the owner is if the work was somehow authorized by Genesis: that is, if Genesis was sufficiently aware of, and involved in, Asamar's work that it might be said that Asamar was working for Genesis.

The courts have considered the issue of the third-party provider a

---

[2]We do not rule out that under certain circumstances an entity such as Polygon could be a statutory agent of an entity such as Genesis even though Polygon (by itself) is not considered an authorized party under the statute.  In this case, Galehead has failed to present a triable issue of fact on whether Polygon acted as Genesis's authorized agent (as opposed to Polygon's having only a contractual relationship to supply fuel to Genesis) for the August and September 1995 fuelings.

6

number of times. Where the level of involvement between the owner and the third-party provider was significant and ongoing during the pertinent transaction, the courts have found a triable issue of fact about whether the third-party deserved a lien. In <u>Marine Coatings, Inc., of Alabama v. United States</u>, 932 F.2d 1370 (11th Cir. 1991), the plaintiff--a subcontractor who made repairs on a couple of vessels at the request of the contractor--survived a summary judgment motion; these facts were material: (1) the owner of the vessel was aware of the subcontractor's performance before and during the performance; (2) the subcontractor performed between 35% and 50% of the work performed on the vessels; (3) the owner inspected the subcontractor's work; (4) the owner gave provisional and final acceptance to the subcontractor's work; and (5) the repairs were fully accepted and compensated for. <u>Id.</u> at 1376 & n.9.[3]

   <u>Stevens Technical Services, Inc. v. United States</u>, 913 F.2d 1521 (11th Cir. 1990), involved facts similar to <u>Marine Coatings</u> and a similar result. In <u>Stevens,</u> the owner was aware beforehand of the repairer's role: the repairer

_____

   [3]Although the court listed these facts in a related context, these same facts led the court to conclude independently that a material issue of fact existed on whether the owner "procured [the subcontractor's] work, authorized the work, or ratified the procurement of . . . the work." <u>Id.</u> at 1376. So, the owner was denied a summary judgment.

was listed in the contract with the owner as a party performing 15% or more of the work, and the owner also knew the principal contractor was incapable of doing the work itself.  Id. at 1534.  Moreover, the owner dealt with the repairer in terms of "discussing, testing and inspecting work done by [the repairer.]"  Id. at 1535.

But other cases illustrate that a third-party provider is not entitled to a lien where the degree of involvement with the owner is minimal or nonexistent.  In Bonanni Ship Supply, Inc. v. United States, 959 F.2d 1558,1559 (11th Cir. 1992), the third-party provider (a subcontractor) was not listed on bids submitted to the owner.  The undisputed facts showed no agreement (written or oral) between the subcontractor and the owner.  Id. Moreover, the record showed no evidence that the owner was aware of the subcontractor's performance.  Id.  In those circumstances, summary judgment for the owner was granted.  Id. at 1565.

In Tramp Oil & Marine, LTD. v. M/V Mermaid I, 805 F.2d 42, 45 (1st Cir. 1986), the third-party fuel-broker who arranged for fueling had no relationship with the owner, and the owner did not know of the third-party until after the transaction when it was billed.  Summary judgment was granted to the owner in that case as well.  Id. at 46.

8

This case seems much more like <u>Bonanni Ship Supply</u> and <u>Tramp Oil</u> than like <u>Marine Coatings</u> or <u>Stevens Technical</u>.  We suppose that Genesis was, in some technical sense, aware of Asamar's involvement by means of bunker confirmations (dated a few days before physical delivery)[4] forwarded to Genesis by Polygon; but the contract to supply fuel was between Genesis and Polygon.  Moreover, Polygon was seemingly capable of performing its contract with Genesis without Asamar's aid (as it did in the third fueling).  Genesis physically received no bunkers from Asamar.  Genesis did not communicate with Asamar or inspect Asamar's work or otherwise ratify Asamar's role.   Even after the fueling, Asamar directed all its complaints and requests for payment to Polygon, which in turn relayed the messages to Genesis.

On this record, the evidence is insufficient to show that Asamar had the kind of relationship with Genesis that would establish that Genesis authorized Asamar's work on the vessel.  Polygon is the party that dealt with Genesis.  That a charterer of a vessel becomes aware that some work performed was by a party somewhere down the chain of contracting and re-contracting does not give rise to a maritime lien.

---

[4]Nothing in the record shows when Genesis received copies of the confirmations.

## II. Value of the Lien

The district court initially awarded Galehead the full amount of the contract with Anglia ($24,376.00) but then reduced that amount to $20,349.29 on Anglia's motion for amendment of the order. Anglia argues on appeal that $20,349.29 is the right amount because it represents the reasonable value of the necessaries (fuel bunkers) provided, which is all a maritime lien claimant is entitled to. Adding a commission or profit to that number, Anglia argues, would remove the contract from maritime jurisdiction. We disagree.

Anglia cites no case law that supports its contention that these profits are of a non-maritime nature and thus outside the maritime jurisdiction of the courts. There seems to be good reason for this dearth of precedent. If profit on necessaries supplied to a vessel were considered non-maritime, we worry that there could be no such thing as a maritime contract for necessaries. Very few suppliers, repairers, or fuellers, we suspect, are going to supply goods or services to a vessel at cost (that is, without profit or mark-up). And those that did would likely not be in business long.

The proper value of the maritime lien is ordinarily the value of the underlying contract that gives rise to the lien. A maritime lien is "[a] special

10

property right in a ship given to a creditor by law as security for a debt or claim subsisting from the moment the debt arises[.]" Black's Law Dictionary 969 (6th ed. 1990). The natural valuation of the lien then is the value of the debt irrespective of whether a profit is part of that debt. No precedent to the contrary has been called to our attention.

### Conclusion

We AFFIRM the judgment of the district court granting partial summary judgment to Anglia on the two Asamar liens and granting partial summary judgment to Galehead on the Polygon lien. We VACATE the trial court's decision on the amount of the lien, however. The correct amount is $24,376.00.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**