REVISED, JANUARY 24,2000

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-30983
_____

LAKE CHARLES STEVEDORES, INC

Plaintiff - Appellant

v.

PROFESSOR VLADIMIR POPOV MV, in rem

Defendant - Appellee

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

December 23, 1999

Before KING, Chief Judge, and SMITH and STEWART, Circuit Judges.

KING, Chief Judge:

Plaintiff-Appellant Lake Charles Stevedores, Inc. appeals the district court's dismissal of its in rem proceeding against Defendant-Appellee, the Professor Vladimir Popov M/V, arguing that the court erred in determining that the stevedores had no maritime lien. We affirm.

I. FACTS AND PROCEDURAL BACKGROUND

As is often the situation in transactions involving the shipping of goods, a number of different parties were at least indirectly involved in the transaction at the heart of this case.

Terms of the initially contemplated transaction were defined in January, 1997, when ED&F Man Sugar, Inc. ("Man Sugar"), a subsidiary of ED&F Man, Inc., agreed to purchase from Broussard Rice Mill, Inc. ("Broussard") 5000 metric tons of rice at $18.40 c.w.t. (price F.O.B. mill), for delivery some time between the last half of February and the first half of March. The purchase agreement indicates that the final contract price would include the cost of the bags to contain the rice, of freight from the mill to the dock, of unloading the trucks, and of stowing and trimming (i.e., stevedoring services). Adding the cost of these items to the base price for the rice alone ($18.40 c.w.t.) yields an anticipated final price of $20.05 c.w.t. The sale of 5000 tons of rice, under the same terms, was confirmed in a document Broussard sent to Man Sugar on February 3, 1997.

In part because Man Sugar could not secure a vessel by mid-February, delivery could not occur when originally expected. The contract was amended on March 24, 1997 to provide for 4600 (rather than 5000) tons of rice at $20.05 c.w.t., delivery F.O.B. vessel sometime in early April. The contract price again included stevedoring, with no change in the $.90 c.w.t. cost. Man Sugar also agreed to make progress payments of $19.15 c.w.t. when loads of 1500 tons reached the dock in order to prevent Broussard from having to carry the costs associated with delay in delivery. The balance ($.90 c.w.t.) was due when full and complete shipping documents were presented.

Man Sugar was able to gain access to the Professor Vladimir Popov M/V (the "Vessel") in March 1997. Savannah Chartering

Ltd., the disponent owner of the Vessel, had time chartered the Vessel to Marine Trading, Ltd. ("Marine Trading") in June 1996. The charter party between Savannah Chartering and Marine Trading provided that

> [t]he Captain (although appointed by the Owners), shall be under the orders and direction of the Charterers as regards employment and agency; and Charterers are to load, stow and trim, and secure the cargo at their expense under the supervision of the Captain, who is to sign bills of lading for the cargo as presented, in conformity with the mate's or talley clerk's receipts.[1]

In a document dated March 20, 1997, Marine Trading voyage chartered the Vessel to Sugar Chartering, Inc., another subsidiary of ED&F Man. The charter party provided that stevedores were to be employed by Sugar Chartering. Sugar Chartering subchartered the Vessel to Man Sugar.

On April 24, 1997, freight forwarder Mary Reid of Reid & Company ("Reid"), acting on behalf of Broussard, asked Lake Charles Stevedores, Inc. ("LCS") to submit a bid for loading the rice. At the time Reid contacted LCS, it was told it would be working for Broussard. Reid also obtained an "all inclusive" bid from another stevedoring concern in the area. In order to assist in comparing the bids, Reid asked LCS to submit an all-inclusive bid. Although the first bid LCS submitted to Reid was copied to Broussard, the second bid was not. LCS' second bid noted that the vessel's gear would be used unless it was slow, in which case LCS' shore gear would be used at LCS' expense. Broussard awarded

---

[1] Under a rider clause, charterers, subcharterers, or their agents could sign bills of lading for and on behalf of the Master in conformity with the Mate's receipt.

3

the contract to load the Vessel to LCS.  Reid relayed this information to LCS.  LCS had often worked for Broussard in the past, generally unloading its trucks at the docks, but also loading ships under prior F.O.B. contracts.

During April, Broussard delivered the rice to the docks. After receiving confirmation that loads of rice had been delivered, Man Sugar made payments as per the parties' agreement. Lake City Steamship Agency ("LCSA"), a division within LCS, was hired by Marine Chartering, an agent of Marine Trading, to act as vessel agent.  In this capacity, LCSA was responsible for coordinating the Vessel's movement in and out of port and meeting its requirements while in port.  LCSA prepared the Notice of Readiness, indicating that the Vessel was in port and ready to be loaded, and transmitted it to Reid, who was also the local agent for Man Sugar, on April 30, 1997.

LCS loaded the Vessel on May 1, May 2, and May 5, 1997.  The Vessel's mate or master signed LCS' Activity Sheets[2] and Mate's Receipt.  A clean bill of lading was signed by LCSA for the Vessel's master.  When it received the required shipping documents from Reid, Man Sugar made its final payment, in the amount of $90,761.78, to Broussard.  This amount was described as stevedoring expenses in Man Sugar's accounts.  LCS sent an invoice to Broussard, but to no other entity, for the stevedoring services rendered.  Although Broussard charged Man Sugar $18 per short ton of cargo for stevedoring services (or $.90 c.w.t.), LCS

_____

[2]  Activity sheets, necessary to issue a Mate's Receipt, described the work performed each day.

4

charged Broussard only $14 per short ton, yielding a total bill of $65,395.07. The difference in price was attributed by the district court to Broussard's acceptance of risk of loss due to weather conditions or other contingencies.

LCS had never had difficulty collecting on its accounts with Broussard. However, in this instance, the bill from LCS remained unpaid. On September 30, 1997, after LCS learned that Broussard had been put into receivership, LCS had the Vessel arrested in order to secure payment for the stevedoring services. ED&F Man and Sugar Chartering each filed claim for the Vessel.

The Vessel's claimants and LCS filed motions for summary judgment, each of which was denied. The case was tried without a jury on July 28, 1998. The district court held that LCS was not entitled to a lien because there was no contract between LCS and the charterers, there was no evidence that Broussard was the owner's or a charterer's agent, and the owner's or charterer's knowledge that LCS was apparently the stevedoring concern hired by Broussard to load the rice was insufficient to create a lien. LCS timely appeals.

## II. STANDARD OF REVIEW

Because we face an admiralty case tried without a jury, we review the district court's legal conclusions de novo. See Nerco Oil & Gas, Inc. v. Otto Candies, Inc., 74 F.3d 667, 668 (5th Cir. 1996). The district court's factual findings are reviewed under the clearly erroneous standard. See Fed. R. Civ. P. 52(a); Nerco, 74 F.3d at 668. The clearly erroneous standard of review

5

does not apply to factual findings made under an erroneous view of controlling legal principles.  See Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc., 747 F.2d 995, 1000 (5th Cir. 1984).

### III.  DOES LCS HAVE A MARITIME LIEN?

The purpose of maritime liens is "to enable a vessel to obtain supplies or repairs necessary to her continued operation by giving a temporary underlying pledge of the vessel which will hold until payment can be made or more formal security given." Southern Coal & Coke Co. v. F. Grauds Kugniecibas ("The Everosa"), 93 F.2d 732, 735 (1st Cir. 1938); see also Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 9 (1920) ("Since she is usually absent from the home port, remote from the residence of her owners and without any large amount of money, it is essential that she should be self-reliant – that she should be able to obtain upon her own account needed repairs and supplies."); A.L. Veverica v. Drill Barge Buccaneer No. 7, 488 F.2d 880, 883 (5th Cir. 1974) ("The very purpose of maritime liens is to encourage necessary services to ships whose owners are unable to make contemporaneous payment.").[3]  They are largely

---

[3]  Although credit to the vessel remains a fundamental concept underlying the maritime lien, see Equilease Corp. v. M/V Sampson, 793 F.2d 598, 605 (5th Cir. 1986) ("Equilease II"), it is no longer the case that a claimant providing necessaries on the order of one with authority to procure them must prove that credit was given the vessel in order to establish a lien.  See § 31342(a)(3); Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co., 254 U.S. 1, 12 (1920) ("The act relieves the libelant of the burden of proving that credit was given to the ship when necessaries are furnished to her upon order of the owner . . . .").

statutorily created.  See In re Admiralty Lines, Ltd., 280 F. Supp. 601, 604-05 (E.D. La. 1968) ("[A]dmiralty law has long ago ceased to create new liens.  The only liens recognized today are those created by statute and those historically recognized in maritime law.").  Thus, in order to resolve the issues raised in this case, we must look to the Maritime Commercial Instruments and Liens Act ("MCILA"), 46 U.S.C. § 31301 et seq., which defines the circumstances under which a party is entitled to a maritime lien.

In brief, the MCILA states that a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner has a maritime lien on the vessel, see § 31342(a),[4] unless the provider of the necessaries has waived its right to the lien.  See § 31305.  Section 31341(a) lists entities presumed to have authority to procure necessaries: (1) the owner; (2) the master; (3) a person entrusted with the management of the vessel at the port of supply; or (4) an officer or agent appointed by the owner, a charterer, an owner pro hac vice, or an agreed buyer in possession of the vessel.  An element common to these entities is that they may be presumed to have

---

[4]  Under § 31342(a),

Except as provided in subsection (b) of this section, a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner–
(1)  has a maritime lien on the vessel;
(2)  may bring a civil action in rem to enforce the lien; and
(3)  is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342(a).

7

authority to procure necessaries on the vessel's account.  <u>Cf.</u>

<u>Ferromet Resources v. Chemoil Corp.</u>, 5 F.3d 902, 904 (5th Cir.

1993) ("The ship's master or other person, such as a charterer,

to whom the vessel is entrusted is presumed to have authority to

purchase necessaries to the credit of the vessel.").[5]  The

presumption created in § 31341 is not conclusive, <u>see</u> <u>Marine</u>

---

[5]  That § 31342(a) and § 31341(a) refer to authority to
procure necessaries <u>on the vessel's account</u> is also reflected in
the law the MCILA replaced in 1988, the Federal Maritime Lien
Act, 46 U.S.C. § 971 et seq., and in the 1971 amendments to that
Act.  Under the pre-1971 version of § 973 of the Federal Maritime
Lien Act,

> [t]he officers and agents of a vessel specified in
> section 972, shall be taken to include such officers
> and agents when appointed by a charterer, by an owner
> pro hac vice, or by an agreed purchaser in possession
> of the vessel; but nothing in this chapter shall be
> construed to confer a lien when the furnisher knew, or
> by exercise of reasonable diligence could have
> ascertained, that because of the terms of a charter
> party, agreement for sale of the vessel, or for any
> other reason, the person ordering the repairs,
> supplies, or other necessaries was without <u>authority to
> bind the vessel therefor</u>.

(emphasis added).  The 1971 amendments eliminated all language
after the semicolon in order to remove from suppliers the
obligation to investigate whether the entity ordering necessaries
was, in fact, with authority to bind the vessel.  <u>See</u> <u>Atlantic &
Gulf Stevedores, Inc. v. M/V Grand Loyalty</u>, 608 F.2d 197, 201
(5th Cir. 1979).  This created a statutory presumption that
certain entities (those listed in § 972 and the remaining portion
of § 973) had authority to bind the vessel.  The MCILA maintains
that presumption, with the entities now all listed in § 31341(a).
Although the 1971 amendments made it easier for suppliers of
necessaries to obtain liens, <u>see id.</u>, they did not alter the
definition of "authority."  <u>Cf.</u> <u>Jan C. Uiterwyk Co. v. MV Mare
Arabico</u>, 459 F. Supp. 1325, 1329 (D. Md. 1978) (noting that the
1971 amendments to the Federal Maritime Lien Act did not
eliminate the requirement that necessaries be procured by an
entity with authority to do so).  The definition of authority was
also not changed when the MCILA was enacted.  <u>See</u> H.R. REP. NO.
100-918, <u>reprinted in</u> 1988 U.S.C.C.A.N. 6108, 6129, 6141 (noting
that no substantive change from prior law is intended in enacting
the MCILA).

8

Coatings v. United States, 932 F.2d 1370, 1376 (11th Cir. 1991), and thus can be rebutted by, for example, a showing that the provider of necessaries had actual knowledge of a no-lien clause that prevented the entity ordering those necessaries from binding the vessel.  See Belcher Oil Co. v. M/V Gardenia, 766 F.2d 1508, 1512 (11th Cir. 1985); Gulf Oil Trading Co. v. M/V Caribe Mar, 757 F.2d 743, 749 (5th Cir. 1985).  As a result, a supplier of necessaries ordered by a § 31341(a) entity subject to a no-lien clause not made known to the supplier has a maritime lien.

It is undisputed that stevedoring services are necessaries, and that LCS provided those services.  The case thus raises two basic issues.  The first issue is whether "the person who placed the order had authority to do so, either real, apparent, or statutorily presumed," i.e., whether LCS has a maritime lien. Belcher Co. v. M/V Maratha Mariner, 724 F.2d 1161, 1164 (5th Cir. 1984); see also Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty, 608 F.2d 197, 202 (5th Cir. 1979) ("Authorization, actual or fairly presumed, given prior to or during rendition of services, or ratified subsequent to rendition will suffice."). If LCS had a maritime lien, the second issue we must address is whether LCS waived its right to that lien.

LCS takes issue with both the findings of fact and the conclusions of law underlying the district court's determination that it was not entitled to a lien.  LCS states that the findings of fact are clearly erroneous, and also argues that the standard applied to find that LCS relied only on Broussard's credit was improper.  Further, LCS argues that, contrary to the district

9

court's determination, it obtained a valid maritime lien because (1) Broussard had actual authority from the Vessel's owners; (2) Broussard had apparent authority; (3) the services it supplied were ratified by the master; and (4) it did not forgo its lien.

A.   Authority - Real, Apparent, or Statutorily Presumed

The parties stipulated that Broussard made the final selection of LCS as the company to load the bagged rice onto the Vessel.  If Broussard had authority to act on behalf of the Vessel when it employed LCS, then LCS has a maritime lien.  See § 31342(a).  Citing Jan C. Uiterwyk Co. v. MV Mare Arabico, 459 F. Supp. 1325 (D. Md. 1978), in support, LCS points to the nature of services supplied to argue that Broussard had actual authority from the Vessel's owners or charterers to engage LCS to supply stevedoring services.  LCS notes that the Jan C. Uiterwyk court specifically recognized that "[a]rrangements for these [stevedoring] services must be made by the ship's master or someone authorized by him", 459 F. Supp. at 1330, and that "[i]t is hardly the responsibility of a mere shipper to arrange for services necessary for a vessel to enter a port, to receive cargo and to leave the port."  Id. at 1331.  LCS traces the line of authority from the charter to Marine Trading to the charter to Sugar Chartering, noting that the authority to employ stevedores was passed on at each stage.  LCS continues this line of reasoning to conclude that Broussard was authorized by the Vessel's owners to employ stevedores to board and load the Vessel because the authority could come from nowhere else.  A similar

10

"nature of service" argument is made in support of LCS'
contention that Broussard had apparent authority to hire the
stevedores.[6]  Broussard is also argued to have been entrusted
with the management of the Vessel at the port of supply because
it employed LCS, a stevedoring concern.  Further, LCS contends
that Broussard was able to, and did authorize the use of the
Vessel's gears when it accepted LCS' bid, which indicated that
the Vessel's equipment could be used.  In addition, LCS points to
the legislative history of the 1971 amendments to the Federal
Maritime Lien Act, 46 U.S.C. § 971 et seq., as supporting the
notion that stevedores can presume that they have a lien when
they supply services to a vessel.

The MCILA identifies in § 31341(a) the entities that can be
statutorily presumed to have authority to procure necessaries on
the vessel's account.  The presumption created in § 31341 is not
a function of the services supplied – both § 31341 and § 31342
speak in terms of necessaries without further distinction.[7]
Unless Broussard is one of the entities listed in § 31341(a), the

_____

[6]  LCS also asserts that Reid had apparent authority to
obtain stevedoring services, that Reid awarded the contract to
LCS, and that she was a person entrusted with the management of
the vessel at the port of supply, see § 31341(a), given her
capacity as Man Sugar's local agent.  Because we find no
indication in the record that the district court's finding that
LCS at all relevant times knew it was hired solely by Broussard
is clearly erroneous, we must reject these arguments.

[7]  The MCILA separates stevedoring services from others in
§ 31301(5), which provides that a "preferred maritime lien" is
one "(A) arising before a preferred mortgage was filed under
section 31321 of this title . . . (C) for wages of a stevedore
when employed directly by a person listed in section 31341 of
this title."  This provision is not applicable to the instant
case.

11

statute does not allow for a presumption that it had authority to procure the necessaries on the ship's account simply because the necessaries provided were stevedoring services.

We must therefore undertake to determine whether Broussard qualifies as any of the entities listed in § 31341(a). Broussard is clearly not the owner of the Vessel, or its master. It is also not "a person entrusted with the management of the vessel at the port of supply." § 31341(a)(3); see also Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 279-80 (1940) (describing management as "a broader term connoting direction and control for the purposes for which the vessel is used" and finding a charterer to have been entrusted with the management of the vessel). In Atlantic & Gulf Stevedores, we found a chief officer to be a person to whom management of the vessel was entrusted, based on his position within the command hierarchy, his duties, which specifically included the direction and control of loading and unloading, and historic practice. See 608 F.2d at 200. There are no such indicators here. This was Man Sugar's first purchase of rice from Broussard. Broussard was contractually obligated to undertake the steps necessary to get the specified quantity of rice onto the Vessel. It was not entrusted with the management of the Vessel at the port of supply.

Whether Broussard is an agent appointed by Man Sugar, as subcharterer, is a somewhat closer question. In interpreting whether Broussard is an agent, we look to general principles of agency law, see Marine Fuel Supply & Towing, Inc. v. M/V Ken

12

*Lucky*, 869 F.2d 473, 477 (9th Cir. 1989); *Cactus Pipe & Supply Co. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985); *Esso Int'l, Inc. v. The SS Captain John*, 443 F.2d 1144, 1146 (5th Cir. 1971), and consider "the roles of the parties in the transactions." *Marine Fuel Supply*, 869 F.2d at 477. Unless the district court's findings regarding the existence of an agency relationship are clearly erroneous, we must accept those findings. *See Equilease v. M/V Sampson*, 756 F.2d 357, 363 (5th Cir. 1985) ("*Equilease I*") (en banc) ("The existence of any agency relationship is a question of fact which should not be reversed on appeal unless it is clearly erroneous.")(citing *Strachan Shipping Co. v. Dresser Indus., Inc.*, 701 F.2d 483, 487 (5th Cir. 1983)).

We assume that Man Sugar had authority to employ stevedores on the Vessel's account.[8] It is clear from the contract between Man Sugar and Broussard that Broussard was not given express authority to employ stevedores on behalf of the Vessel. The sales contract makes no reference to Broussard's acting as Man Sugar's agent.

Given the terms of the sales contract and the parties' actions under that contract, Broussard also did not have implied authority to procure stevedoring services on the Vessel's

---

[8] The terms of the subcharter between Sugar Chartering and Man Sugar do not include language expressly pertaining to procuring stevedoring services. Under § 31341(a), however, Man Sugar would be presumed to have authority to procure such services on the Vessel's account. *See Marine Fuel Supply*, 869 F.2d at 476 n.3 (noting that a subcharterer is treated as a charterer for purposes of the Maritime Lien Act).

13

account.[9]  Because the contract provided for delivery F.O.B.

vessel,[10]  title to the rice was to stay with Broussard until

loading was completed.  Broussard was therefore responsible for

loading its, not Man Sugar's, rice.  The sales contract also set

the cost for stevedoring services at $.90 c.w.t., with no

allowance for delays or other contingencies.  Cf. South Carolina

State Ports Auth. v. M/V Tyson Lykes, 67 F.3d 59, 61 (4th Cir.

1995) (finding no agency relationship where subcontractor billed

only the contractor, there was no contract between the

subcontractor and the charterer, and under the agreement between

the charterer and the general contractor, the charterer was to

pay the contractor on a flat "pick-rate," i.e., per container,

---

[9]  Much of LCS' argument in support of its contention that Broussard had "authority" to employ stevedores appears to rest on the assumption that because Broussard was able to employ an independent stevedoring concern, Broussard had the authority to employ stevedores on the Vessel's account.  LCS argues that, given the circumstances, Broussard and Man Sugar anticipated that Broussard would employ an independent stevedoring concern and thus that Broussard had the authority under the sales contract to do so.  We do not consider the ability to employ LCS as synonymous with the authority to employ LCS on the Vessel's account.  See note 5 supra.  Moreover, we view the expectation that Broussard would use an independent concern to load the rice as insufficient to grant to Broussard the authority to hire stevedores on the Vessel's account, and therefore reject the approach apparently taken in Riedel Envtl. Servs., Inc. v. M/V Tula, 1987 A.M.C. 2378 (S.D. Ala. 1987).  See discussion of general contractor and middle-man cases infra.

[10]  LCS uses this fact to argue that Broussard was given authority to hire stevedores.  That the final contract price would include costs of loading the rice onto the Vessel, however, was a term of the agreement reached in January, 1997, before Man Sugar had access to a ship, let alone the Vessel.  Although the contract was amended after Man Sugar became the subcharterer to the Vessel, the F.O.B. delivery term was not among the terms altered.  Under these circumstances, it is difficult to find that the F.O.B. terms are responsible for transferring the requisite authority from Man Sugar to Broussard.

14

basis).  Broussard thus agreed to shoulder the risk that actual stevedoring costs may have been greater than the amount owed by Man Sugar.[11]

The crux of LCS' "nature of services" argument appears to be that because stevedores must board a vessel in order to supply their services, authority to hire LCS must have passed from the Vessel's owners through all intermediate parties to Broussard. We must reject this argument.  Man Sugar may have granted Broussard, and by extension, its employees, and its subcontractors permission to board.  However, this does not translate to authority to employ stevedores on the Vessel's account.  On brief, LCS characterizes the F.O.B. terms as Man Sugar's allocating to Broussard the responsibility for choosing, and paying, a stevedoring concern.  There is no suggestion in the record that Man Sugar retained any control over Broussard's selection of stevedores, or over the price Broussard was to pay for actual stevedoring services rendered.  Neither Broussard nor Reid approached Man Sugar with the stevedoring bids before LCS was selected.  Cf. id. ("[I]t has not been shown that a court has found an agency relationship between an operator and a stevedore in the absence of contractual provisions or clear evidence of control and supervision by the operator.").  In short, the

---

[11]  For an example of a contractor incurring substantially greater costs than initially anticipated when the agreement between the contractor and the vessel's charterers was reached, see Cresent City Marine, Inc. v. M/V Nunki, 20 F.3d 665 (5th Cir. 1994).  In that case, the contractor was paid $27,644.64 by the charterer, but was billed for $80,768.66 by the subcontractors. Id. at 667.

15

district court did not err in concluding that Broussard was not the Vessel's agent.

LCS also argues that Broussard had apparent authority to procure stevedoring services. Because LCS testified that it did not know the identity of the company to which Broussard was supplying rice, but did know that a company separate from Broussard was involved in the transaction, Broussard's purported principal was partially disclosed. A partially disclosed principal may be liable if its actions before LCS led LCS reasonably to believe that Broussard was acting as its agent. See Cactus Pipe, 756 F.2d at 1111 ("Apparent authority is created as to a third person by conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to the act done on his behalf by the person purporting to act for him."); Restatement (Second) of Agency, § 159 cmt. e (1958) ("There may be apparent authority in the case of a partially disclosed principal. This is created where, by means of a document or other thing, the principal manifests that the agent is to act for whoever made the manifestation."); Restatement (Second) of Agency § 8 cmt. c ("Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized."). We must therefore assess whether the owner, Marine Trading, Sugar Chartering, or Man Sugar undertook actions that caused LCS reasonably to believe that Broussard was its agent.

The record shows limited contact between LCS and the

16

Vessel's owner or charterers.  LCS testified it did not know who owned the rice when it was loaded, and that no one told LCS that Broussard had the authority to commit another entity to the payment of stevedoring services.  LCS sent invoices only to Broussard, and did not pursue alternate means of payment until after it learned Broussard went into receivership.  The parties stipulated that prior to commencement of stevedoring services, the master provided instructions to LCS as to how the stevedoring was to be performed.  The record contains a May 1 document signed by the Captain of the Vessel regarding the shoes the stevedores were to wear, their use of metal hooks, and what was to be done with damaged bags of rice.  The crew opened and closed the Vessel's hatches for the stevedores.  The mate or the master of the ship signed LCS' Activity Sheets and the Mate's Receipt.  An agent of Marine Trading signed the bill of lading.  Based on this evidence, the district court's finding that LCS had no reason to believe, and did not in fact believe that Broussard was acting on the Vessel owner's order when it retained LCS to load the rice was not clearly erroneous.

An important feature of the instant case is the absence of a contract between Man Sugar (or Sugar Chartering) and LCS.  This is not an unusual set of circumstances facing a supplier of necessaries.  There are two lines of cases that deal with such circumstances: the general contractor/subcontractor line, see, e.g., Galehead, Inc. v. M/V Anglia, 183 F.3d 1242 (11th Cir. 1999); Cresent City Marine, Inc. v. M/V Nunki, 20 F.3d 665 (5th Cir. 1994); Port of Portland v. M/V Paralla, 892 F.2d 825 (9th

17

Cir. 1989), Integral Control Sys. Corp. v. Consolidated Edison Co., 990 F. Supp. 295 (S.D.N.Y. 1998); South Carolina State Ports Auth. v. M/V Tyson Lykes, 837 F. Supp. 1357 (D.S.C. 1993), aff'd, 67 F.3d 59 (4th Cir. 1995), and the principal/agent, or middle-man, line of cases, see Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky, 869 F.2d 473 (9th Cir. 1989); Tramp Oil & Marine, Ltd. v. M/V "Mermaid I", 805 F.2d 42 (1st Cir. 1986); Belcher Co. v. M/V Maratha Mariner, 724 F.2d 1161 (5th Cir. 1984).

Under the general contractor line, the general contractor supplying necessaries on the order of an entity with authority to bind the vessel has a maritime lien. See Galehead, 183 F.3d at 1245 (holding that contractor had lien and could recover for services performed by subcontractors); Gulf Oil Trading, 757 F.2d at 750-51 (finding general contractor who hired subcontractor to supply barge service had lien prior to having actual notice of a no-lien clause); Ceres Marine Terminals, Inc. v. M/V Harmen Oldendorff, 913 F. Supp. 919, 923 (D. Md. 1995) (holding that contractor had lien and could recover amounts attributable to services actually performed by subcontractors). However, subcontractors hired by those general contractors are generally not entitled to assert a lien on their own behalf, unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance. See, e.g., South Carolina State Ports Auth., 67 F.3d at 61; Port of Portland, 892 F.2d at 828; Farwest Steel Corp. v. Barge Sea-Span 241, 828 F.2d 522, 526 (9th Cir. 1987). But see Skandinaviska-Enskilda Banken v. C.L.C. Marine Servs., Ltd. (In re SeaEscape

18

<u>Cruises, Ltd.)</u>, 172 B.R. 1002, 1008 (S.D. Fla. 1994) (finding subcontractor had a lien without analyzing authority of contractor); <u>Riedel Envtl. Servs., Inc. v. M/V Tula</u>, 1987 A.M.C. 2378 (S.D. Ala. 1987) (holding plaintiff, a subcontractor, had made out a prima facie case showing it was entitled to a lien in part because contractor was impliedly authorized to use subcontractors). Under the middle-man line of cases, despite what can be a large number of intermediaries, the ultimate supplier of the necessaries may obtain a maritime lien under certain circumstances. <u>See, e.g.</u>, <u>Marine Fuel Supply</u>, 869 F.2d at 477.

LCS argues strenuously that LCS, not Broussard, is a general contractor, and that Broussard is a middle-man. The sales contract between Man Sugar and Broussard merely allocated to Broussard the responsibility for identifying and paying the stevedores. The primary distinguishing characteristic between a general contractor and a middle-man that LCS identifies is that a general contractor can be expected to supply the necessary itself, whereas a middle-man is not expected to do so. According to LCS, because Broussard, as a rice mill, could not be expected to supply stevedoring services itself, it was a middle-man and not entitled to a lien. Instead, LCS, as the actual supplier of the necessaries, has the lien.

A review of the so-called middle-man cases does not reveal, contrary to what LCS suggests, that the actual deliverer of necessaries to the vessel is the entity entitled to a lien in every instance. For example, the court in <u>Exxon Corp. v. Central</u>

19

Gulf Lines, Inc., 780 F. Supp. 191 (S.D.N.Y. 1991), taking note of the Supreme Court's view of the circumstances of the case, see Exxon Corp. v. Central Gulf Lines, Inc., 500 U.S. 603, 612-13 (1991), held that the party contractually obligated to supply the fuel (Exxon) was entitled to a lien, despite the fact that it had caused another supplier to actually deliver the ordered fuel to the vessel. See 780 F. Supp. at 194.

A similar result was obtained in A/S Dan-Bunkering Ltd. v. M/V Zamet, 945 F. Supp. 1576 (S.D. Ga. 1996). Dan-Bunkering, which had a contract with the charterer to supply the necessaries, contacted a broker, which in turn caused two other independent firms to deliver the necessaries to the vessel. The court found that Dan-Bunkering was entitled to a lien. Id. at 1579. Moreover, although the parties viewed the two firms actually delivering the necessaries as entitled to the lien, the court thought it "conceivable" that this was not the case, citing Bonanni Ship Supply, Inc. v. United States, 959 F.2d 1558, 1565 (11th Cir. 1992), a "general contractor" case, in support. Id. Under general contractor cases, the actual deliverer of necessaries often is not entitled to a lien. See, e.g., Galehead, 183 F.3d at 1245 ("[A]lthough Polygon did not physically supply the bunkers, a party need not be the physical supplier or deliverer to have 'provided' necessaries under the statute.").

In two of the cases LCS cites in support of its middle-man argument, the court suggested that the actual deliverers of the necessaries would be entitled to liens. See Tramp Oil & Marine,

20

805 F.2d at 44 ("No one disputes that Exxon and Colonial, as direct suppliers to the Mermaid, would be entitled to a maritime lien."); Belcher, 724 F.2d at 1163 ("Thus, when Belcher supplied fuel to the [vessel], a maritime lien may have arisen by operation of law . . . ."); id. at 1164 ("If American law had been applicable when the vessel was attached in the Netherlands, the supplier of fuel would have had a lien on the vessel . . . ."). However, it was not necessary for these courts to consider whether Exxon, Colonial, or Belcher had a maritime lien under U.S. law, and thus we need not consider ourselves bound by these statements. Cf. Cresent City Marine, 20 F.3d at 670 (noting that language from Belcher relied on by party was dicta).

In the final case cited by LCS, Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky, 869 F.2d 473 (9th Cir. 1989), a subcharterer's managing agent, acting on the subcharterer's orders and instructions, contacted a firm it was authorized to order fuel through,, which in turn instructed another firm to place the order for the vessel's supplies with Marine Fuel. Marine Fuel was subsequently notified that it had been nominated by the vessel's owner to supply the vessel. It was also notified of the identity of the vessel's husbanding agent, which arranged for delivery of the necessaries. Marine Fuel supplied the fuel, which the master of the vessel accepted. The court found that the order originated from the subcharterer, who had authority to bind the vessel, and that, under the circumstances, Marine Fuel was entitled to a lien. With the exception of the master's acceptance of the necessaries, LCS can point to no similar

21

circumstances here.

We are persuaded by our review of these cases that it is not whether an intermediary can be expected to supply the necessaries itself that distinguishes instances in which the actual suppliers have liens, but it is rather the nature of the relationship between each pair of entities that are involved in the transaction at issue (e.g., agent vs. independent contractor). We view the facts of the instant case as more akin to those in which general contractors have been engaged to supply a service and have called upon other firms to assist them in meeting their contractual obligations. Had Broussard not delivered the rice in accordance with the sales contract's terms, it would have been liable for breach. As noted above, Man Sugar retained no control over the selection of a stevedoring concern, and Broussard accepted all the risk associated with the occurrence of events that would increase the costs of stevedoring services beyond what the sales contract provided. Simply put, Broussard was obligated to provide for the delivery of rice onto the Vessel, but was not authorized to act on behalf of Man Sugar in procuring stevedoring services.

Whether a contractor could be expected to hire subcontractors has been considered in assessing whether the subcontractors have liens. See Galehead, 183 F.3d at 1246 (noting that contractor was seemingly capable of performing under its agreement without resort to subcontractors); Stevens Technical Services, Inc. v. United States, 913 F.2d 1521, 1534 (11th Cir. 1990) (noting that the owner knew contractor was

22

incapable of doing the work itself).  However, decisions have generally not suggested that such an expectation is sufficient to grant the requisite authority.  The <u>Stevens</u> court, for example, also noted that the contract with the general contractor listed the subcontractor, the general contractor refused to take responsibility for subcontractor's work, and that the vessel's operators dealt with subcontractor representatives in discussing, testing, and inspecting the subcontractor's work.  <u>See id.</u> at 1534-35.  Other courts have seemingly ignored evidence suggesting that the vessel's owners or charterers were aware that a subcontractor would be used, <u>see, e.g.</u>, <u>Cresent City Marine</u>, 20 F.3d at 668, and even that a particular subcontractor would most likely be used.  <u>See, e.g.</u>, <u>South Carolina State Ports Auth.</u>, 67 F.3d at 60 (noting that the subcontractor was the only entity that possessed the equipment necessary to perform the work); <u>Port of Portland</u>, 892 F.2d at 828 ("The most the Port has shown is the fact that it was most likely, even perhaps rather certain, that Northwest would choose the facilities of the Port when it did its work.").

In keeping with the notion that subcontractors may acquire liens where the vessel's owners retain control over their selection and/or performance,[12] the Ninth and Second Circuits

_____

[12]   The connection to principal/agent concepts is clear. This has been the connection for some time.  <u>See</u> <u>The Juniata</u>, 277 F. 438, 440 (D. Md. 1922) ("The cases in which a so-called subcontractor has been held entitled to a lien or a right in the nature of a lien against the ship appear all to have been cases in which, upon the facts, it was possible reasonably to hold that he was not a subcontractor at all, but had an agreement with the owner, made through the contractor as the owner's agent . . .

require that an entity with authority to bind the vessel <u>direct</u> that the general contractor hire a particular subcontractor in order for that subcontractor to be entitled to a lien. <u>See</u> <u>Port of Portland</u>, 892 F.2d at 828; <u>Farwest</u>, 828 F.2d at 526; <u>Integral Control Sys.</u>, 990 F. Supp. at 301. In other cases in which subcontractors have been found to be entitled to a lien, those subcontractors were identified and accepted by the vessel's owner or charterer prior to performance. <u>See</u> <u>Stevens</u>, 913 F.2d at 1525, 1534; <u>Turecamo of Savannah, Inc. v. United States</u>, 824 F. Supp. 1069, 1072 (S.D. Ga. 1993). Owner involvement in directing, testing, and/or inspecting subcontractor performance has also been cited in support of finding a lien in favor of a subcontractor. <u>See</u> <u>Stevens</u>, 913 F.2d at 1535; <u>cf.</u> <u>Marine Coatings</u>, 932 F.2d at 1375 n.9 (listing operator's inspecting subcontractor work and giving provisional and final acceptance to work performed by the subcontractor among evidence that supported court's conclusion that a genuine issue of fact existed regarding general contractor's authority to bind the vessel). Based on these cases, we agree with the district court that LCS has not shown it was entitled to a lien under the circumstances presented here.

It is possible that § 31341 allows entities other than those listed to be proved to have authority to order necessaries on behalf of the vessel. <u>See</u> <u>Marine Coatings</u>, 932 F.2d at 1376. However, our respect for the principle of <u>stricti juris</u> prevents

---

.").

us from holding that a supplier of rice that is party to an F.O.B. vessel contract has been given the authority, by virtue of that contract, to employ the stevedores on the Vessel's account. Cf. Atlantic & Gulf Stevedores, 608 F.2d at 200-01 ("[M]aritime liens are to be strictly construed, i.e., they are not to be lightly extended by construction, analogy, or inference . . . ."); Integral Control Sys., 990 F. Supp. at 301 (assessing whether the Eleventh Circuit's approach in contractor/subcontractor cases should be adopted, and deciding against doing so given the Second Circuit's commitment to a stricti juris approach to maritime liens).


## B. Ratification

LCS argues that the actions on the part of the master of the Vessel operated to ratify its providing stevedoring services and thereby to bind the Vessel. A large portion of its ratification argument rests on the absence of any objection on the part of the Vessel's agents to LCS boarding the Vessel, and on its contention that the Vessel's awareness that LCS was supplying the necessaries is sufficient under the MCILA to constitute authorization. The evidence that LCS looks to as supporting its ratification arguments includes: LCS was provided instructions prior to loading the Vessel; the Vessel's hatches were opened and closed for the stevedores by the crew; the mate or the master of the ship signed LCS' Activity Sheets and the Mate's Receipt; the stevedores were allowed on board without objection; and they used the Vessel's gear; and the crew, not Broussard, supervised the

25

loading operation.

Much of this evidence reduces to a showing that the master of the Vessel allowed LCS on board to perform stevedoring services and accepted those services. Under the contract between Man Sugar and Broussard, Broussard was obligated to deliver the rice free-on-board the Vessel. Had the Vessel's agents not allowed the stevedores to load the rice, they would have prevented Broussard from fulfilling its contractual obligations. Under these circumstances, we are hesitant to declare that the Vessel's agents subjected the res to liability for stevedoring services necessary to enable Broussard to deliver the rice as per its agreement with Man Sugar.

As the district court noted, awareness on the part of the Vessel's agents that LCS was apparently the firm chosen by Broussard to load the rice is insufficient under the MCILA to constitute authorization. See Galehead, 183 F.3d at 1246 ("That a charterer of a vessel becomes aware that some work performed was by a party somewhere down the chain of contracting and re-contracting does not give rise to a maritime lien."); Port of Portland, 892 F.2d at 828 ("It cannot be denied that [the vessel's owner] knew that [the general contractor] was using the Port's facilities, but that has never been held to be sufficient to establish a lien."). A holding that awareness that necessaries are being supplied was sufficient, even though those necessaries were procured by an entity without authority to bind the vessel, would render the statute's authority requirement meaningless.

26

We must also reject LCS' contention that acceptance of LCS' services and the rice aboard ship provided the necessary authorization to entitle it to a lien. It is a settled principle of contract law that a contract requiring A to supply X to C is satisfied if B, hired by A, provides X to C. See Galehead, 183 F.3d at 1245 (citing Restatement (Second) of Contracts § 318 cmt. a, illus. 2, in support of its holding that a contractor provided necessaries to a vessel when the contractor's subcontractor delivered fuel to the vessel). Under the circumstances here, the delivery of the rice, though performed by LCS, is attributed to Broussard. Acceptance of the rice on the part of the Vessel, through signing of Activity Sheets and the Mate's Receipt, was therefore acceptance of Broussard's rice and Broussard's delivery of that rice. See Galehead, 183 F.3d at 1245; Ceres Marine Terminals, 913 F. Supp. at 923. As a result, we do not view the activities on the part of the Vessel's master and crew to constitute ratification.

The cases LCS cites in support of its ratification argument are distinguishable. In Yacht, Mary Jane v. Broward Marine, Inc., 313 F.2d 516 (5th Cir. 1963), the "real" captain did not object while work ordered by the "nominal" captain was going on. The nominal captain had no actual authority to place orders. We affirmed the lower court's conclusion that this supported a finding of implied authorization. Had the case been brought under the Federal Maritime Lien Act, the nominal captain would no doubt have been viewed as clothed with presumed authority to bind the vessel, having been named the "master" and appointed by the

27

owner of the vessel.  Cf. <u>Port of Portland</u>, 892 F.2d at 827 (citing <u>Yacht, Mary Jane</u> as an example of courts finding implied authority in individuals listed in § 972).  The <u>Jan C. Uiterwyk</u> court found that the vessel's charterer and master approved of the use of JCU, a firm providing agency and terminal services, authorized JCU firm to sign bills of lading on behalf of the master and/or owner, and ordered services directly from JCU.  LCS can point to no similar actions on the part of the charterers, the master, or the crew here.[13]

Because we find that the district court was correct in holding LCS was not entitled to a maritime lien, we need not consider the waiver issue.


IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's dismissal of LCS' in rem action against the Vessel.

---

[13]  Although a stevedoring concern was also a plaintiff in this case, it may be argued that the finding that JCU was accepted as ship's agent was crucial to the stevedores being entitled to a lien.  JCU had either supplied, or procured, all of the services at issue in the case. See <u>Jan C. Uiterwyk</u>, 459 F. Supp. at 1327.