HAYNES, Circuit Judge, dissenting:
*298 The majority opinion fails to follow our prior precedent in Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV , 199 F.3d 220, 231 (5th Cir. 1999) and creates an unnecessary circuit split with the Eleventh Circuit. See Galehead, Inc. v. M/V Anglia , 183 F.3d 1242, 1245-46 (11th Cir. 1999) (per curiam); see also Noramco Shipping Corp. v. Bunkers Int'l Corp. , No. 6:02CV515-ORL-22DAB, 2003 WL 22594419, at *7 (M.D. Fla. Apr. 30, 2003) ("Under Eleventh Circuit jurisprudence, the right of a subcontractor to assert a maritime lien against a vessel for necessaries is not restricted by a rigid rule but instead depends on the degree of involvement between the owner and the subcontractor."). Accordingly, I respectfully dissent.
I agree that Valero is a subcontractor under the "general contractor/subcontractor" line of cases. Lake Charles explains the general proposition that "subcontractors hired by those general contractors are generally not entitled to assert a lien on their own behalf, unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance." 199 F.3d at 229. However, this exception is not as narrow as the majority opinion makes it seem. Unmentioned by the majority opinion, in Lake Charles we made clear that the "subcontractor" line of cases is itself divided into two lines of cases: (1) cases requiring "an entity with authority to bind the vessel" to "direct that the general contractor hire a particular subcontractor in order for that subcontractor to be entitled to a lien"; and (2) cases requiring the subcontractor to be "identified and accepted by the vessel's owner or charterer prior to performance." Id. at 231. In the second line of cases, "[o]wner involvement in directing, testing, and/or inspecting subcontractor performance has also been cited in support of finding a lien in favor of a subcontractor."[1] Id. We clearly adopted both lines of cases but found that the subcontractor in Lake Charles did not meet either one. See ids="1753162" index="70" url="https://cite.case.law/f3d/199/220/#p231">id.
The Eleventh Circuit has embraced the second line of cases. In Marine Coatings of Alabama v. United States , the Eleventh Circuit addressed the question of the availability of a subcontractor lien in a repair services contract. 932 F.2d 1370, 1375-76 (11th Cir. 1991). There, the United States Navy entered into Master Ship Repair Contracts with Braswell Shipyards, Inc., that permitted Braswell to hire subcontractors, although "the contracts did not purport to make Braswell an agent of the government." Id. at 1372. Braswell subcontracted with Marine Coatings of Alabama, Inc. ("MCI"), for the painting, cleaning, and coating of three vessels, and the United States inspected and approved MCI's work. Id. at 1373. The United States paid Braswell, but Braswell filed for Chapter 11 *299 without paying MCI. Id. Despite being a subcontractor, MCI asserted a maritime lien against the three vessels, and the Eleventh Circuit found "a genuine issue as to whether the government procured MCI's work, authorized the work, or ratified the procurement of MCI's work. Alternatively, there is a genuine issue as to whether Braswell was authorized by the government to procure MCI's work." Id. at 1376.
Likewise, in Stevens Technical Services., Inc. v. United States , the Sealift Antarctic needed a "major overhaul." 913 F.2d 1521, 1525 (11th Cir. 1990). Marine Transport Lines, Inc. ("MTL"), on behalf of the United States government, solicited bids, and Atlantic submitted a bid that identified Stevens as a subcontractor. Id. Atlantic then entered into a memorandum of understanding with Stevens, dividing the work between the two of them. Id. Subsequently, Atlantic's bid was accepted and MTL awarded it the contract. Id. During the course of the work, government representatives inspected, tested, and approved the work performed by both Atlantic and Stevens. Id. at 1525-26. Once work was completed, MTL paid Atlantic, but Atlantic failed to pay Stevens. Id. at 1526. Stevens subsequently filed actions against Atlantic in personam and against the Sealift Antarctic in rem . Id. In vacating and remanding for further reconsideration, the Eleventh Circuit pointed to several factors that might have indicated Stevens was entitled to a maritime lien: (1) that the government's representatives were aware of Steven's performance and the principal contract showed Stevens as a subcontractor having more than 15 percent of the contract's value; (2) that the government's representatives knew that Atlantic was not capable of full performance on its own; (3) that the contract covering the work was fully authorized by the government's representatives; (4) that the government's representatives worked directly with Stephens in discussing, testing, and inspecting Stephen's work; and (5) that all of the work was accepted and fully compensated to Atlantic. Id. at 1534-35.
Here, the majority opinion significantly understates Almi's involvement in the bunkering transaction when it describes it as a "one-off transaction in which the vessel owner was merely aware of the subcontractor's identity." To the contrary, the parallels to Stevens , in light of the standards adopted in Lake Charles , are clear: (1) during negotiations with O.W., Almi made a point to discover who would perform the bunkering; it did not object to Valero's selection and thus impliedly approved Valero prior to finalizing the bunkering agreement; (2) Almi knew that O.W., as a "reputable bunker trader," could not bunker the vessel itself but would purchase bunkers from a physical supplier; (3) the contract with O.W., which designated Valero as the supplier, was fully authorized by a party with authority to bind the vessel; (4) the vessel's agents engaged directly with Valero and tested and approved of Valero's bunkers; and (5) the vessel's agents approved of the bunkers and signed a certificate confirming performance.
The majority opinion's reliance on Barcliff, LLC v. M/V Deep Blue, IMO No. 9215359 is misplaced. See 876 F.3d 1063, 1071-73 (11th Cir. 2017). As an initial matter, Barcliff determined that the central issue here was not properly before it, thus the commentary relied on by the majority opinion is mere dicta. See ids="12266569" index="85" url="https://cite.case.law/f3d/876/1063/#p1071">id. at 1073. Even if it were not dicta, Barcliff does not mandate the result reached by the majority opinion. As already shown, similar to Stevens , Almi "was sufficiently aware of, and involved in, [Valero's services] that it might be said that [Valero] was working for [it]." See ids="12266569" index="86" url="https://cite.case.law/f3d/876/1063/#p1071">id. at 1071 (quoting *300 Galehead , 183 F.3d at 1245 ). Moreover, Barcliff does not exclude one-off bunkering services that satisfy this rule. Barcliff indicated that the exception has not been applied where the owner's involvement was "minimal or non-existent," and then it observed that "[o]ne of those cases involved fuel provision." Id. at 1072 (citing Tramp Oil & Marine, Ltd. v. M/V Mermaid I , 805 F.2d 42, 45 (1st Cir. 1986) ). In Tramp Oil , however, no relationship existed between the vessel's owner and the fuel broker seeking the lien, and the vessel's owner did not know about the fuel broker (who was retained by an intermediary) until after its work was completed. See Tramp Oil , 805 F.2d at 45 ("In this case, however, no relationship existed between Tramp and the vessel, and neither the vessel owner nor the charterer even knew of Tramp until after Tramp had made the payment to Exxon.").
Although a subcontractor, the interactions between the vessel and Valero are such that Valero is entitled to assert a maritime lien. That O.W. was expected to pay Valero is not the point; "[e]xpectations that payment for the services would be made by some party other than the vessel does not vitiate a lien by one who, as permitted under [the Act], is not required to prove reliance on the credit of the vessel."[2] Stevens , 913 F.2d at 1536.
For these reasons, I conclude Valero is entitled to relief. From the majority opinion's decision to the contrary, I therefore respectfully dissent.

Compare Galehead , 183 F.3d at 1245 ("Where the level of involvement between the owner and the third-party provider was significant and ongoing during the pertinent transaction, the courts have found a triable issue of fact about whether the third-party deserved a lien."), with Cianbro Corp. v. George H. Dean, Inc. , 596 F.3d 10, 17-18 (1st Cir. 2010) (holding that subcontractor was not entitled to a lien where "the record establishes that [the vessel's owners] did not have any participation in the subcontracting of this work or control over its performance"), and Bonanni Ship Supply, Inc. v. United States , 959 F.2d 1558, 1565 (11th Cir. 1992) ("[T]he mere fact of acceptance and full compensation to the prime contractor, absent any allegation that the [vessel's owner] had any knowledge of performance by the subcontractor plaintiff , is insufficient to create a genuine issue of material fact regarding whether the plaintiff was a maritime lienor under the MCILA.").

Verna argued in its brief and at oral argument that it has already paid OW Malta for the fuel in order to settle a contractual arbitration dispute in the United Kingdom; that this decision will result in Verna being forced to pay twice for the same fuel. That reality is one of Verna's own making-an attempt to extinguish O.W.'s claims while this action was pending. I note that Almi Tankers expressed concern to O.W. regarding the conglomerate's financial situation and reserved the right to pay Valero directly, ultimately deciding to pay O.W. Verna's unilateral decision does not control the outcome here.