892 F.2d 825
 1990 A.M.C. 846
 The PORT OF PORTLAND, an Oregon municipal corporation,
Plaintiff-Appellant,
and
The Connecticut National Bank, Trustee-Mortgagee,
Plaintiff-Intervenor-Appellee,
v.
The M/V PARALLA, Defendant-Appellee.
 No. 88-4101.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 30, 1989.
Decided Dec. 27, 1989.
 
 Paul N. Wonacott and Kim Jefferies, Wood, Tatum, Mosser, Brooke & Landis, Portland, Or., for plaintiff-appellant.
 Clifford B. Alterman, Wayne D. Palmer and Mary Ellen Farr, Kell, Alterman & Runstein, Portland, Or., and John J. Reilly, Mark C. Flavin and Claire Saady, Haight, Gardner, Poor & Havens, New York City, for plaintiff-intervenor- appellee.
 Joseph M. VanLeuven, Ragen, Tremaine, Krieger, Schmeer & Neill, Portland, Or., for M/V Paralla.
 Appeal from the United States District Court for the District of oregon.
 Before WRIGHT, TANG and FERNANDEZ, Circuit Judges.
 FERNANDEZ, Circuit Judge:
 
 
 1
 The Port of Portland, an Oregon municipal corporation ("the Port"), brought this in rem action to foreclose a maritime lien on the M/V Paralla ("the Paralla"). After a bench trial, the district court found that the Port did not acquire a lien on the Paralla and that if it did acquire a lien, that lien was waived. The court entered judgment accordingly. Port of Portland v. M/V Paralla, 703 F.Supp. 1446 (D.Or.1988). The Port appeals from that judgment. It contends, among other things, that a general contractor retained to do a conversion on the Paralla had authority to bind that vessel. We disagree and affirm.
 
 FACTS
 
 2
 Automar IV created a wholly owned subsidiary, American Automar, Inc. ("Automar") for the purpose of purchasing, refitting and reselling the Paralla. The refitting or conversion project was necessary, since the prospective purchaser was the United States Department of Transportation Maritime Administration, which planned to use the ship in the Ready Reserve Fleet. Automar in turn retained C.R. Cushing & Co. as a technical consultant on the reconditioning project. Automar also employed Pacific Gulf & Marine, Inc. ("Pacific Gulf") to manage the conversion and to locate a general contractor to perform the conversion services. Pacific Gulf hired William Burns, one of its retired vice presidents, to oversee the project. In addition, the financing for the project was obtained from Connecticut National Bank (CNB) which received a first preferred ship's mortgage as security.
 
 
 3
 The search for a general contractor eventually narrowed to three possible companies: Southwest Marine, Dillingham Ship Repair ("Dillingham"), and Northwest Marine Ironworks, Inc. ("Northwest"). Southwest Marine was located in San Diego, California. Both Dillingham and Northwest were located in Portland, Oregon. Southwest Marine was able to offer a better price than Dillingham or Northwest, because the latter two companies had their primary facilities in Portland, and the Port charged rather high use fees for services it provided to them. Nevertheless, Burns was inclined to prefer one of the Portland companies, and leaned toward Northwest in particular.
 
 
 4
 Although the Port did have established fee tariffs that it charged to general contractors which used its facilities, it was able to deviate from those. It was often willing to do that, since it had long-term relationships with the contractors, and, of course, it was to everyone's benefit if the contractors could stay competitive with other shipyards on the west coast.
 
 
 5
 Thus, before Automar made its final decision on use of a general contractor, the Port and Northwest held a meeting, which Automar representatives attended. The use fee issue was discussed at that meeting, and some time later the Port agreed with Northwest and with Dillingham that it would reduce the fees it charged to them if they obtained the Paralla conversion contract.
 
 
 6
 Thereafter, Automar decided to award the contract to Northwest. It then entered into a written agreement with Northwest. That agreement made no mention of the Port, and did not direct that the Port's facilities be used. Moreover, it expressly provided that Northwest would not have authority to incur liens on behalf of the Paralla. Management of the project remained with Automar and Pacific Gulf, the latter personified in Mr. Burns.
 
 
 7
 Northwest and the Port then entered into an agreement wherein the Port provided facilities to Northwest, which it intended to use for the conversion project. This contract was not joined in by Automar. In fact, the Port had a policy of refusing to enter into contracts with the owners of ships.
 
 
 8
 The conversion itself proceeded smoothly and in that respect Northwest was a good choice. Unfortunately, Northwest was in rather serious financial difficulty. The Port undoubtedly knew that, and in all likelihood the ship's owners and agents were also aware of it. Northwest was paid by Automar, and Northwest used those funds to pay the Port. However, the payments made to the Port went to earlier Northwest bills, and not to those being incurred on the Paralla project.
 
 
 9
 On October 29, 1986, the now refitted Paralla put to sea, and Northwest put itself into bankruptcy. On November 4, 1986, the Port arrested the Paralla for the purpose of exercising and foreclosing its claimed lien rights upon that vessel. As already noted, the trial court ultimately decided that no such lien rights existed.
 
 JURISDICTION AND STANDARD OF REVIEW
 
 10
 The district court had jurisdiction pursuant to 28 U.S.C. § 1333, and we have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 11
 We are bound to uphold the district court's findings of fact unless they are clearly erroneous. See Marine Fuel Supply and Towing, Inc. v. M/V Ken Lucky, 869 F.2d 473, 475 (9th Cir.1988); Farrell Ocean Services, Inc. v. United States, 681 F.2d 91, 93 (1st Cir.1982). We review the district court's construction of the Federal Maritime Lien Act, 46 U.S.C. §§ 971-973 de novo.[1] Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky, 869 F.2d at 475; United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc) (generally, questions of law are reviewed de novo), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). In general, mixed questions of fact and law are also reviewed de novo. McConney, 728 F.2d at 1204.
 
 DISCUSSION
 
 12
 Under 46 U.S.C. § 971, when a party claims the right to a maritime lien it must meet three requirements. It must show that it: "(1) furnish[ed] repairs, supplies, or other necessaries, (2) to any vessel, (3) 'upon the order of the owner of such vessel, or of a person authorized by the owner.' " Foss Launch & Tug Co. v. Char Ching Shipping U.S.A., Ltd., 808 F.2d 697, 699 (9th Cir.), cert denied sub nom. Itel Containers Intern. Corp. v. M/V C.C. San Francisco, 484- U.S. 828, 108 S.Ct. 96, 98 L.Ed.2d 57 (1987).
 
 
 13
 In this case, there is no doubt that the Port furnished necessaries to the Paralla. The parties do not dispute that. The only issue which separates them is whether the services of the Port were rendered upon the order of Automar or upon the order of someone who was authorized by Automar to bind the vessel.
 
 
 14
 A. Order by the Owner.
 
 
 15
 As the statute makes plain, if an owner directly orders necessaries, that will result in a lien on the vessel. It is clear that no such direct relationship existed between the Port and Automar, so this aspect of the statute need not detain us further.
 
 
 16
 B. Presumed Agents.
 
 
 17
 There is another group of persons who are presumed to have authorization to create liens on the vessel. Those are listed in 46 U.S.C. § 972. They are: "the managing owner, ship's husband, master, or any person to whom the management of the vessel at the port of supply is entrusted." The presumption is not irrebuttable, but the courts have shown a tendency to find implied authority in these individuals, even when the owner claims that it did not, in fact, give them that authority. See Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky, 869 F.2d 473, 477-78 (9th Cir.1988) (Master did not in fact have authority, but presumed authority sufficient. Same as to subcharterer.), Yacht, Mary Jane v. Broward Marine, Inc., 313 F.2d 516, 517 (5th Cir.1963) (Visible captain did not, in fact, have authority. Real captain did not object to work), and Jan C. Uiterwyk Co., Inc. v. M/V Mare Arabico, 459 F.Supp. 1325 (D.Md.1978) (master and time charter had presumed authority to bind the vessel.)As the above cases indicate, where there is presumed authority secret agreements between the owner and his presumed agents will not thwart a lien claimant.
 
 
 18
 In the case at hand, the Port has not shown that it dealt with any persons who had presumed authority to bind the vessel. It does claim that it dealt with Northwest, the general contractor, and we must therefore consider the status and authority of that company.
 
 
 19
 C. General Contractors. It is the general rule that a general contractor does not have the authority to bind a vessel. That rule was clearly stated in Farwest Steel Corp. v. Barge Sea-Span 241, 828 F.2d 522 (9th Cir.1987), cert. denied, 485 U.S. 1034, 108 S.Ct. 1594, 99 L.Ed.2d 909 (1988), where the court said at page 526:
 
 
 20
 [W]here subcontractor suppliers have sought maritime liens, courts interpreting section 972 have uniformly held that the general repair contractor was not endowed with sufficient 'management' authority to support a section 971 lien.
 
 
 21
 In fact, at page 526, the Farwest court went on to quote the following statement from 2 Benedict on Admiralty Section 38 n. 2 (7th ed. 1986) with approval:
 
 
 22
 [B]ecause it can rarely be shown that the contractor was acting not as a contractor but as the agent of the owner, a subcontractor will normally not be entitled to a lien since he extends credit to the contractor and not the ship.
 
 
 23
 Here the Port dealt with Northwest and not with Automar or Automar's managing agent. It cannot be denied that Automar knew that Northwest was using the Port's facilities, but that has never been held to be sufficient to establish a lien.
 
 
 24
 Of course, the mere fact that an entity is a general contractor will not preclude it from being an agent under proper circumstances. We recognized that possibility in Farwest, when we stated at page 526 of 828 F.2d:
 
 
 25
 The sole exception to the rule against the subcontractor lien will occur where the subcontractor has been engaged by a general contractor in circumstances where the general contractor was acting as an agent at the direction of the owner to engage specific subcontractors for repairs.
 
 
 26
 Here it is quite clear that Northwest was not the actual agent of the owner. Not only did the owner have its agents on the scene in the person of Mr. Burns, and others, but its contract with Northwest expressly provided that Northwest was not the owner's agent and could not incur liens on behalf of the vessel.[2] The Port points out that an owner can still become responsible for the services of a subcontractor, if the owner has ordered the general contractor to retain that subcontractor. We do not deny that possibility. It is indicated by Farwest itself. It is also suggested by Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky, 859 F.2d at 1409, although in that case the connection is a bit more attenuated. See also The Juniata, 277 F. 438, 440-41 (D.Md.1922). Unfortunately for it, the Port's evidence in this respect was quite deficient, and the district court did not err when it determined that no such authority existed. The most the Port has shown is the fact that it was most likely, even perhaps rather certain, that Northwest would choose the facilities of the Port when it did its work. That alone does not constitute a direction or requirement to use those services. Nor does the fact that Automar attended a meeting between the Port and Northwest at which the Port's fee structure was discussed change matters. No agreement was reached at that meeting. In any event, the agreements between Northwest and the Port were of no more concern to Automar than the Port says the Automar-Northwest agreements were to it. In fact, the Port assiduously avoided any direct agreements with owners of vessels.
 
 
 27
 The mere fact that the Port had a secret intention to lien the Paralla if things between the Port and Northwest went sour does not change the legal posture of the parties. Here everyone chose to ignore the legal and financial positions of everyone else. The Port made no effort to ask Northwest about the source of the funds it was using to pay the Port's bills, and Automar made no effort to ask Northwest if it was paying its subcontractors. We do not say there is anything legally wrong with that, but the parties should then expect to be bound by the technical rules of law. If you choose to blind yourself to reality, you may fall into a pit. Here the Port has done just that.
 
 
 28
 Finally, we note the Port's claim that Northwest had implied authority to bind the vessel. However, the cases where implied authority have been found have usually dealt with situations where there was a serious misleading of the subcontractors. Many of those cases involved situations where the agents had presumed authority.[3] In other cases, the situation has been quite unique. For example, in J.G. Warner v. The Bear, 130 F.Supp. 549 (D.Alaska 1955), the owner actually participated in most of the negotiations when the insurance company agents engaged people to do repairs, and in Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty, 608 F.2d 197, 200 (5th Cir.1979), the chief officer of the ship was second in command to the master. It was held that he had implied authority to bind the vessel to a stevedore's lien, since it was customary for stevedores to rely upon the chief officer of the ship. Again, none of these relationships appears in this case. General contractors do not usually have authority to bind vessels and the Port attempts to build too imposing an edifice on sand when it seeks to rely on the single meeting with Automar.
 
 
 29
 In short, all the Port can show is that Automar knew that Northwest would most likely use the Port's facilities, even though Northwest was not contractually obligated to do so. We hold that knowledge without more is not enough to bind the vessel. The Port cannot eschew having any relationship with vessel owners, and at the same time claim the right to lien their vessels simply because a general contractor uses the facilities of the Port.
 
 CONCLUSION
 
 30
 The district court did not err when it determined that the Port failed to prove that it supplied services upon the order of the owner of the Paralla or upon the order of a person authorized by the owner. As a result, the Port did not acquire a lien upon the vessel. That being so, we need not consider whether it waived a lien that it never had in the first place. AFFIRMED.
 
 
 
 [1]
 Sections 971, 972 and 973 have been repealed and replaced by Sections 31341 and 31342. The new sections take effect January 1, 1989. They do not affect cases filed before that date
 
 
 [2]
 We do not mean to say that the existence of a "no lien" clause will preclude a presumed agent--or perhaps an implied agent in proper circumstances--from creating a lien upon the ship. We only note that the contractual provision underscores the lack of actual agency in this case
 
 
 [3]
 See the discussion in part B above