17-0922-cv; 17-0931-cv
*U.S. Oil Trading LLC v. M/V VIENNA EXPRESS; Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2017

(Argued:  April 19, 2018       Decided:  December 19, 2018)

Docket Nos. 17-0922-cv[*], 17-0931-cv[*]

_____

U.S. OIL TRADING LLC,

*Plaintiff-Appellant*,

- v. -

M/V VIENNA EXPRESS, her tackle, boilers, apparel, furniture, engines, appurtenances, etc., *in rem*, M/V SOFIA EXPRESS, her tackle, boilers, apparel, furniture, engines, appurtenances, etc., *in rem*,

*Defendants-Appellees*,

---

[*]     These appeals were consolidated for purposes of oral argument and are consolidated for purposes of the present opinion.  They were also consolidated for oral argument with the appeals in Nippon Kaisha Line Ltd. v. NuStar Energy Services, Inc., No. 17-1378, and Clearlake Shipping PTE Ltd. v. NuStar Energy Services, Inc., No. 17-1458, which are resolved today in separate decisions.

HAPAG-LLOYD AKTIENGESELLSCHAFT, as claimant to the *in rem* defendant M/V VIENNA EXPRESS,

> *Third-Party-Plaintiff-Counter-Claimant-Counter-Defendant-Appellee,*

- v. -                                                  17-922-cv

U.S. OIL TRADING LLC,

> *Counter-Defendant-Third-Party-Cross-Defendant-Appellant,*

ING BANK N.V.,

> *Third-Party-Defendant-Counter-Claimant-Cross-Claimant-Appellee,*

O.W. BUNKER GERMANY GMBH,

> *Third-Party-Defendant-Counter-Claimant-Appellee,*

O.W. BUNKER & TRADING A/S, CREDIT AGRICOLE CORPORATE & INVESTMENT BANK, a division or arm of Credit Agricole S.A.,

> *Third-Party-Defendants.*

_____

_____

HAPAG-LLOYD AKTIENGESELLSCHAFT,

> *Plaintiff-Counter-Defendant-Appellee,*

- v. -                                                  17-931-cv

2

U.S. OIL TRADING LLC,

*Defendant-Cross-Defendant-Appellant*,

O.W. BUNKER GERMANY GMBH,

*Defendant-Counter-Claimant-Appellee*,

ING BANK N.V.,

*Defendant-Cross-Claimant-Counter-Claimant-
Appellee*,

O.W. BUNKER & TRADING A/S, CREDIT AGRICOLE S.A., O.W. BUNKER USA, INC., CREDIT AGRICOLE CORPORATE & INVESTMENT BANK,

*Defendants.*[**]

_____

Before: KEARSE, CABRANES, and LOHIER, *Circuit Judges*.

Appeals by U.S. Oil Trading LLC ("USOT") from orders and May 2, 2017

partial final judgments of the United States District Court for the Southern District of

New York, Valerie E. Caproni, *Judge*, rejecting claims by USOT that it was entitled to

assert maritime liens against vessels, owned or chartered by Hapag-Lloyd

Aktiengesellschaft ("Hapag"), to which USOT, pursuant to arrangements with and

---

[**]    The Clerk of Court is instructed to amend the official caption in each
appeal to conform with the above.

3

among other entities, physically supplied marine fuel for which USOT was not paid following the bankruptcies of the entities involved in the supply contracts with USOT or Hapag. The district court denied USOT's motions for summary judgment on its maritime-lien claims and entered partial final judgments dismissing those claims, ruling that the claims were governed by the Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301 *et seq.*, and that physical suppliers who were subcontractors were not entitled to maritime liens because their fuel sales were not made "on the order of the owner or a person authorized by the owner" of the vessel, *id*. § 31342(a). *See Clearlake Shipping PTE Ltd. v. O.W. Bunker (Switzerland) SA*, 239 F.Supp.3d 674 (S.D.N.Y. 2017). On appeal, USOT contends principally that the district court erred in finding it was not entitled to a maritime lien in the absence of a contractual or agency relationship with the vessels or with an authorized entity specified in CIMLA, and that USOT was entitled to the liens because Hapag's purchase orders specified that the physical supplier of the fuel was to be USOT. We conclude that purchase orders and admissions by Hapag in these actions permit a conclusion that Hapag directed that USOT be the subcontractor to supply the fuel, thereby bringing USOT within an established exception that allows maritime liens to be asserted by subcontractors whose selection was controlled or directed by the

4

vessel's owner/charterer.  We therefore vacate the judgments and remand for trial on the issue of whether Hapag directed that USOT be the physical supplier.

Vacated and remanded.

JOHN R. KEOUGH, New York, New York (Casey D. Burlage, Corey R. Greenwald, George G. Cornell, Clyde & Co US, New York, New York, on the brief), *for U.S. Oil Trading LLC*.

GINA M. VENEZIA, New York, New York (Michael Fernandez, Michael J. Dehart, Freehill Hogan & Mahar, New York, New York, on the brief), *for M/V VIENNA EXPRESS and Hapag-Lloyd Aktiengesellschaft*.

BRUCE G. PAULSEN, New York, New York (Brian P. Maloney, Seward & Kissel, New York, New York, on the brief), *for ING Bank N.V.*

JUSTIN M. HEILIG, New York, New York (Hill Rivkins, New York, New York; Andrew B. Kratenstein, Darren Azman, McDermott Will & Emery, New York, New York, on the brief), *for O.W. Bunker Germany GmbH*.

KEARSE, *Circuit Judge*:

In these appeals, U.S. Oil Trading LLC ("USOT" or "U.S. Oil")—the plaintiff in No. 17-0922, and an interpleader defendant in No. 17-0931—challenges (a) orders entered in the United States District Court for the Southern District of New York, Valerie E. Caproni, *Judge,* denying USOT's motions for summary judgment on its claims of entitlement to maritime liens for physically supplying marine fuel ("bunkers") to certain vessels owned or chartered by interpleader plaintiff Hapag-Lloyd Aktiengesellschaft ("Hapag"), and (b) partial final judgments entered on May 2, 2017, dismissing USOT's maritime-lien claims. Pursuant to the Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301 *et seq.,* which permits a maritime lien to be asserted by "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner," *id*. § 31342(a)—*see also Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading LLC*, 814 F.3d 146, 151 n.13 (2d Cir. 2016) ("[f]or the purposes of § 31342, bunkers are 'necessaries'")—the district court denied USOT's motions for summary judgment and entered the partial judgments dismissing USOT's claims for liens, ruling that USOT had not provided the fuel to the vessels on the order of the owner or a person authorized by the owner to place such an order. On appeal, USOT contends that the district court erred in finding it was not

6

entitled to maritime liens in the absence of a direct contractual or agency relationship with the vessels or with an authorized entity specified in CIMLA, arguing principally that it was entitled to the liens because Hapag's purchase orders specified that the physical supplier of the fuel was to be USOT. For the reasons that follow, we conclude that purchase orders and admissions by Hapag in these actions permit a finding that Hapag directed that USOT be the subcontractor to supply the fuel, thereby bringing USOT within an established exception that allows maritime liens to be asserted by subcontractors whose selection was controlled or directed by the vessel's owner/charterer or authorized agent. We therefore vacate the judgment and remand for trial on the issue of whether Hapag directed that USOT be the physical supplier.

## I. BACKGROUND

The present cases are among many that have their origin in the financial collapse of O.W. Bunker & Trading A/S ("O.W. Denmark") and its subsidiaries and affiliates (collectively the "O.W. Bunker Group"), a global network of traders and suppliers of bunkers. *See generally ING Bank N.V. v. M/V TEMARA*, 892 F.3d 511, 515

(2d Cir. 2018) ("*Temara*"); *see also Chemoil Adani Pvt. Ltd. v. M/V MARITIME KING*, No. 16-3944, 2018 WL 3359609 (2d Cir. July 10, 2018) ("*Chemoil*"); *Aegean Bunkering (USA) LLC v. M/T AMAZON*, 730 F. App'x 87 (2d Cir. 2018) ("*Aegean*"); *O'Rourke Marine Services L.P. v. M/V COSCO HAIFA*, 730 F. App'x 89 (2d Cir. 2018) ("*O'Rourke*"). Except as indicated below, the following facts, drawn from statements submitted by various parties pursuant to Rule 56.1 of the Local Rules for the Southern District of New York ("Rule 56.1 Statements"), are not in dispute.

A. *USOT's Delivery of Bunkers to Hapag Vessels*

In the fall of 2014, Hapag was the owner and operator of the M/V VIENNA EXPRESS and the M/V SOFIA EXPRESS, and was the time charterer of the M/V SEASPAN HAMBURG and the M/V SANTA ROBERTA (collectively the "Subject Vessels" or "Vessels"). The O.W. Bunker Group, an international operation that both supplied bunkers to ships and arranged the supply of bunkers by others, included O.W. Denmark, O.W. Bunker Germany GmbH ("O.W. Germany" or "OWG"), and O.W. Bunker USA Inc. ("O.W. USA"). USOT was in the business of physically supplying bunkers to oceangoing vessels.

8

In September–October 2014, Hapag, upon receiving fuel replenishment requests from the masters of the respective Vessels, solicited fuel supply bids from a number of potential counterparties. In response, O.W. Germany and several others submitted bids. O.W. Germany, to do so, had requested quotes from its affiliate O.W. USA, which was in charge of the O.W. Bunker Group's bunker procurement in the Americas. O.W. USA, to obtain the necessary information, had contacted physical suppliers, including USOT. For two of the Hapag Vessels, O.W. Germany submitted several bids, each bid describing fuel to be provided by a different physical supplier; for each of the four Vessels, O.W. Germany submitted one bid that listed USOT as the physical supplier. Hapag analyzed the submitted responses in internal spreadsheets that set out for each bid the bidder, the price, details as to fuel quality, and the identity of the physical supplier.

For each of the Subject Vessels, Hapag accepted the O.W. Germany bid that identified the physical supplier as USOT. For each contract, Hapag sent O.W. Germany a purchase order that stated that the supplier would be USOT. (*See* Hapag's Interpleader Complaint ¶ 20, Exhibit 2 ("SUPPLIER: US OIL"); *id*. ¶ 23, Exhibit 3 (same); *id*. ¶ 26, Exhibit 4 ("SUPPLIER: US Oil"); *id*. ¶ 30, Exhibit 5 (same).) After receiving the purchase orders, O.W. Germany sent Hapag sales order

9

confirmations that listed the buyer as Hapag, the seller as O.W. Germany, and the supplier as USOT. (*See* Hapag's Response to USOT's 56.1 Statement ¶¶ 42–43, 74–75, 105–06, 136–37.)

In order to fulfill its contracts with Hapag for the supply of bunkers to the Vessels, O.W. Germany then subcontracted to purchase the bunkers from O.W. USA. (*See* OWG's Rule 56.1 Statement and USOT's Response ¶¶ 36, 72, 103, 133; *see, e.g., id.* ¶ 39 (as to the SEASPAN HAMBURG, "on October 10, 2014, after entering into a contract with Hapag, . . . OW Germany advised . . . OW USA that OW Germany had sold to Hapag at a price of $534 per metric ton, and requested that OW USA purchase the bunker stem offered by USOT")).

With respect to these fuel orders for the four Subject Vessels, USOT delivered the ordered bunkers in October 2014. USOT, on the premise that it had made the sales to O.W. Denmark, sent invoices to O.W. Denmark (O.W. Germany contends instead that USOT sold to O.W. USA); O.W. USA sent invoices to O.W. Germany; O.W. Germany sent invoices to Hapag. On November 7, 2014, O.W. Denmark entered bankruptcy; bankruptcy filings by other members of the O.W. Bunker Group followed. On November 6, Hapag had paid O.W. Germany for the bunkers delivered to the SANTA ROBERTA; O.W. Germany received no

payments with respect to the other three Vessels. USOT has received no payments for the bunkers it supplied to any of the four Vessels.

B. *The District Court's Dismissal of USOT's Lien Claims*

Following the collapse of the O.W. Bunker Group, Hapag, faced with the prospect of competing *in rem* claims by USOT and by O.W. Germany or its lender-assignee, commenced its present interpleader action against USOT, O.W. Germany, O.W. Denmark, and others. Hapag provided security for the amounts due for the bunkers delivered to the Subject Vessels, in the form of a bond with respect to three of the Vessels and a letter of undertaking with respect to the fourth. Hapag requested a determination by the court as to which of the claimants was entitled to recover against the posted security, and a declaratory judgment that Hapag and the Vessels are discharged from all liability with respect to the supply of the bunkers. The court ordered that the interpleader funds would serve as a substitute *res*. *See Clearlake Shipping PTE Ltd. v. O.W. Bunker (Switzerland) SA*, 239 F.Supp.3d 674, 678 n.3 (S.D.N.Y. 2017) ("*Clearlake*").

USOT commenced its present action *in rem* in the United States District Court for the Western District of Washington against the VIENNA EXPRESS and the

11

SOFIA EXPRESS and commenced a similar *in rem* action in the Central District of California against the SEASPAN HAMBURG and the SANTA ROBERTA, seeking to assert maritime liens for the amounts due on the bunkers USOT had delivered to the Vessels. The action filed in Washington was transferred to the Southern District of New York (or "Southern District"); the other action is being held in abeyance in light of the numerous suits pending before several judges in the Southern District, *see generally Clearlake*, 239 F.Supp.3d at 678 ("24 interpleader cases [involving O.W. Bunker Group] . . . were pending before [Judge Caproni] as of June 30, 2015").

Following consolidated discovery proceedings, the parties, at the request of the court, identified test cases for the efficient decision of significant legal issues with respect to the *in rem* claims. *See generally id*. at 678–79. To the extent pertinent to these appeals, USOT's present *in rem* action and Hapag's interpleader action were among those so identified; motions for summary judgment were filed by USOT and O.W. Germany, with each interested party (including Hapag) filing Rule 56.1 Statements as to allegations they disputed and facts they contended were undisputed.

O.W. Germany, opposing USOT's lien claims, contended that USOT could not meet the CIMLA lien prerequisite that USOT show that it provided the bunkers to the Vessels "on the order of" an owner or a person authorized by the

12

owner to order them, 46 U.S.C. § 31342(a). O.W. Germany asserted—and USOT agreed, to an extent—that USOT had no contract with Hapag or anyone authorized to act as Hapag's agent in the ordering of bunkers. USOT conceded that it did not enter into a contract with Hapag for the bunker sales at issue here (*see*, *e.g.*, USOT's Rule 56.1 Statement and Hapag's Response ¶ 7), and that Hapag placed these fuel orders with O.W. Germany and did not contract with O.W. USA, or O.W. Denmark, or USOT (*see* USOT's Response to OWG's 56.1 Statement ¶¶ 26, 69, 100, 130).

However, in response to O.W. Germany's Rule 56.1 Statement asserting that USOT had no "account or direct business relationship with Hapag in October 2014," USOT stated:

> Admits that USOT did not have an account with Hapag, but denies that USOT did not have a direct business relationship with Hapag in October 2014. The undisputed record shows that Hapag, as the Vessels' owner or charterer, analyzed and compared the price and quality of the bunkers offered by USOT with the price and quality offered by other suppliers, and then *selected USOT to deliver the bunkers to Hapag's Vessels*. . . . Hapag specifically named USOT as the supplier of the bunkers on its . . . purchase orders, which Hapag prepared well *before* each delivery.

(USOT's Response to OWG's Rule 56.1 Statement ¶ 14 (emphases in original).) USOT also noted that "[t]he sales order confirmations prepared by O.W. Germany and sent

13

to Hapag" for each delivery specified that the physical supplier would be "USOT." (*Id*.) For the same reasons, USOT also disputed O.W. Germany's assertion that "Hapag did not instruct OW Germany . . . to use USOT . . . for the supply of bunker fuel to [the relevant] vessels . . . and did not control the selection of a physical supplier," reiterating, *inter alia*, that Hapag in its purchase orders, and O.W. Germany in its sales confirmations, had specifically named USOT as the physical supplier for the bunkers ordered. (USOT's Response to OWG's Rule 56.1 Statement ¶ 19.)

In addition, while USOT admitted that "Hapag never advised USOT" that O.W. Germany or O.W. USA would be acting as Hapag's agents for the bunker purchases (OWG's Rule 56.1 Statement and USOT's Response ¶ 31), USOT denied O.W. Germany's assertion that "Hapag never authorized or appointed OW Germany or OW USA as agents to order bunker fuel on Hapag's behalf" (USOT's Response to OWG's Rule 56.1 Statement ¶ 30). USOT stated that "[t]he undisputed record shows that O.W. Germany and O.W. USA were cloaked with at least implied authority while procuring the subject bunkers for Hapag's account." (USOT's Response to OWG's Rule 56.1 Statement ¶ 30 (citing evidence of discussions between USOT and O.W. USA).) USOT also argued that other entities with which it had contact—including Hapag's port coordinator Norton Lilly International, Inc. ("Norton Lilly"), which

forwarded the Hapag bunker orders in emails to USOT, and the Vessels' masters or chief engineers who gave USOT receipts upon delivery of the bunkers—possessed at least implied or apparent authority to bind the Vessels with respect to orders of bunkers.

USOT argued further that as it had physically supplied the fuel, the price of which was in the range of approximately $1.3–$1.5 million for each Vessel—and that as O.W. Germany was merely a middleman that could earn only a small fraction of the value of the fuel—USOT, rather than O.W. Germany, was entitled to the maritime liens as a matter of equity.

In its opinion in *Clearlake*, to the extent pertinent to these two appeals, the district court denied USOT's motions for summary judgment, rejecting its claims for maritime liens because USOT did not provide the bunkers "on the order" of the Vessels or their agents. 239 F.Supp.3d at 684–90 (internal quotation marks omitted). The court stated that maritime liens arise exclusively under CIMLA, that such liens are construed narrowly under the doctrine of *stricti juris*, and that CIMLA "typically require[s]" a finding of "a direct contractual or agency nexus between the supplier and the vessel or its agents." *Id*. at 684. It determined that, because USOT acted as a subcontractor, it "lack[ed] a direct connection to the [Vessels]." *Id*. at 685.

The court—referring to O.W. Denmark and its international subsidiaries collectively as "O.W.," and collectively to the vessels, their owners, or authorized agents as the "Vessel Interests"—noted that USOT contended that it in fact had "a direct relationship . . . to the Vessel Interests":

> Because USOT was identified as O.W.'s supplier in internal analyses prepared by Hapag[] personnel, USOT contends that it, rather than O.W., was nominated as the supplier. . . . USOT [was also] identified as the supplier in the order confirmations exchanged by O.W. and the Vessel Interests.

*Id*. at 686. The court found this contention unpersuasive:

> Direct contacts between . . . Physical Suppliers and agents of the vessel can be relevant if they demonstrate a direct contractual or agency relationship. For example, *when a vessel requires a contractor to use a specific subcontractor there may be a basis to argue that the contractor engaged the subcontractor with actual authority from the vessel*, creating a direct link between the vessel and the subcontractor. *See Port of Portland*[ *v. M/V PARALLA*], 892 F.2d [825,] 828 [(9th Cir. 1989)] ("[*A*]*n owner can still become responsible for the services of a subcontractor, if the owner has ordered the general contractor to retain that subcontractor*." (citing *The Juniata*, 277 F. 438, 440 (D. Md. 1922))). But evidence that the supplier was known to the vessel and coordinated with the vessel to satisfy its obligations to a third party does not establish a legally significant relationship between the vessel and subcontractors. *See Integral Control Sys.*[ *v. Consolidated Edison Co.*], 990 F.Supp [295,] 299-300 [(S.D.N.Y. 1998)] (subcontractor's selection must be "ordered" by the vessel (quoting Port of Portland, 892 F.2d at 828)) . . . .

*Clearlake*, 239 F.Supp.3d at 686–87 (footnote omitted) (emphases ours). The court

concluded that

> [*a*]*t best* (from [USOT's] perspective), the summary judgment record shows that the Vessel Interests viewed . . . USOT as [an] *acceptable* supplier[]. *There is no evidence that the Vessel Interests required O.W. to use* [*USOT*] *to satisfy its obligations* or that [USOT was] directly engaged by agents of the Vessel Interests. *To the contrary, the evidence on this point is that the Vessel Interests were indifferent to the identity of the supplier*[]. The representatives of each of the Vessel Interests *testified that the physical supplier was O.W.'s choice*. . . . [W]hen O.W. provided bids to Hapag[], it included multiple different suppliers, depending on the port of call. For example, in Los Angeles, O.W. used O.W. itself, and in Oakland it used P66. . . . *The uncontradicted testimony from the Vessel Interests is that they saw the choice of physical supplier as essentially O.W.'s to make*. . . . In short, *the inclusion of* [*USOT*] *on the confirmations provided by O.W. and the Vessel Interests does not amount to a "selection" by the Vessel Interests of . . . USOT.*

*Id*. at 688 (emphases ours). The court added that

> [t]he evidence that the Vessel Interests were *aware* of [USOT's] identit[y] and *tacitly* "selected" [it] is potentially a question of fact, particularly as to Hapag[], which included USOT in internal analyses of competing bids. If a question of fact exists on this point, however, it is not material. There is no dispute that the Vessel Interests did not contract with [USOT], and [*USOT does*] *not argue that the contracts required O.W. to use* [*USOT*] *as supplier*[].

*Id*. at 688 n.11 (emphases added).

The district court also rejected contentions by USOT that it was entitled to rely on theories of apparent or implied authority or on principles of equity. *See id*. at 686 n.10, 688–89, 692–94. The court concluded:

> In sum, while the Court sympathizes with [USOT], which apparently believed that [it] held maritime liens and may be financially harmed by this Court's holding that [it does] not, the contractual relationships between the parties in this case are clear, and those relationships must be respected. [USOT] delivered the bunkers to the [V]essels at the direction of O.W. [USOT did not enter] into a contract with the Vessel Interests or their agents, and *the undisputed evidence is that the Vessel Interests did not require O.W. to use* [*USOT*]. These back-to-back contracts were intended, in part, to avoid multilateral obligations that could embroil the [V]essels in litigation between suppliers. It is unfortunate that it may be that [USOT] . . . will suffer from O.W.'s bankruptcy . . . . Ultimately, however, that is not a reason for the Court to depart from the Second Circuit's strict approach to maritime liens.

*Id*. at 689–90 (emphasis added).

Effectively granting summary judgment against USOT on its maritime-lien claims, the court entered a partial final judgment in both the *in rem* action brought by USOT and the interpleader action brought by Hapag, ruling "that USOT does not possess maritime liens pursuant to [CIMLA] against the vessels M/V SANTA ROBERTA, M/V VIENNA EXPRESS, M/V SEASPAN HAMBURG, or the M/V SOFIA

EXPRESS," and "dismissing [USOT's] maritime lien claims." Partial Final Judgment, May 2, 2017, at 2.

## II. DISCUSSION

On appeal, USOT contends principally (1) that the district court erred in concluding that USOT did not show that it had a sufficient contractual nexus with the Vessels' owner/charterer or agents to entitle it to assert maritime liens under the "plain" language of CIMLA (USOT briefs on appeal in No. 17-0922, at 21, and No. 17-0931, at 25); (2) that the court overlooked parts of the record in determining whether USOT was a subcontractor that was entitled to a maritime lien; and (3) that the court should have concluded that USOT is entitled to assert the requested maritime liens as a matter of equity.

Reviewing the district court's summary dismissal of USOT's maritime-lien claims *de novo*, construing the record in the light most favorable to USOT as the party against which summary judgment was entered, and drawing all reasonable inferences in its favor, *see, e.g.*, *Temara*, 892 F.3d at 518; *June v. Town of Westfield*, 370

F.3d 255, 257 (2d Cir. 2004), we reject USOT's first and third arguments, which are largely foreclosed by our recent decision in *Temara*; but we find merit in the second.

A. *CIMLA, Contracts, and Equitable Principles*

As discussed in *Temara*, "[a] maritime lien is a special property right in [a] vessel, arising in favor of the creditor by operation of law as security for a debt or claim, which arises when the debt arises," 892 F.3d at 518 (internal quotation marks omitted). The primary function of such liens "is to facilitate maritime commerce by reducing the . . . risk associated with supplying a vessel that may not return to the same port again." *Id*. at 519. "Maritime liens arise only by operation of law and not by contract," and are "construed under the doctrine of *stricti juris*, meaning that the statutory requirements are construed strictly and may not be expanded by construction, analogy[,] or inference." *Id*. (internal quotation marks omitted).

CIMLA provides, *inter alia*, that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel [and] may bring a civil action in rem to enforce the lien." 46 U.S.C. § 31342(a). It provides, to the extent at issue here, that the following are "persons [who] are presumed to have authority to procure necessaries for a vessel":

20

(1) the owner;

(2) the master;

(3) a person entrusted with the management of the vessel at the port of supply; or

(4) an officer or agent appointed by--

(A) the owner; [or]

(B) a charterer . . . .

*Id*. § 31341(a). There being no question that fuel bunkers are necessaries, and no question in these cases that the bunkers were provided to the Subject Vessels by USOT, the only question under the language of CIMLA was whether USOT did so "on the order of" Hapag or a person authorized by Hapag.

We conclude, substantially for the reasons stated by the district court in *Clearlake*, which parallel those leading our Court to answer such a question in the negative in *Temara*, that the district court correctly ruled that USOT did not adduce evidence that it was ordered to provide the bunkers by Hapag or by an agent authorized by Hapag to order bunkers. As described in Part I.B. above, there is no dispute that, for the Subject Vessels, Hapag ordered the bunkers from O.W. Germany; that O.W. Germany ordered the bunkers from O.W. USA; that O.W. USA ordered the

bunkers from USOT; and that USOT had no contract with Hapag or with O.W. Germany. Although USOT argues that it complied with a chain of contracts for orders that originated with the Vessels' owner or charterer, we agree with the district court that in each of the contracts requiring USOT to deliver the bunkers, USOT's counterparty was neither Hapag nor O.W. Germany. USOT in fact acted upon orders placed by an intermediary between itself and O.W. Germany, and the intermediary was not authorized by the Vessels' owner or charterer to order bunkers for the Vessels.

We also reject, substantially for the reasons stated by the district court, *see Clearlake*, 239 F.Supp.3d at 689, USOT's argument that either communications from Hapag's port agent Norton Lilly in arranging for delivery, or receipts issued by a Vessel's master or chief engineer acknowledging USOT's bunker deliveries, constituted evidence that USOT provided the bunkers on the order of an agent of the Vessels. *See generally Temara*, 892 F.3d at 521 n.6. Coordinating delivery and acknowledging receipt do not indicate that the persons so coordinating and/or acknowledging had placed the bunker orders or been authorized by the owner to do so.

Finally, the district court properly rejected USOT's additional arguments for entitlement to maritime liens purely as a matter of equity. As we stated in *Temara*, such liens cannot properly be conferred on the basis of equitable principles such as unjust enrichment. *See id.* at 522–23; *id.* at 523 (rejecting "the concept of an equitable maritime lien").

B. *The Subcontractor Rule and Its Exception*

In rejecting USOT's claims for maritime liens, the district court noted that "[s]ubcontractors who deal with a contractor or a middle-man lack a direct connection to the vessel," and that "there is a considerable body of law . . . that a subcontractor cannot assert a maritime lien." *Clearlake*, 239 F.Supp.3d at 685 (internal quotation marks omitted) (citing, *inter alia*, *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV*, 199 F.3d 220, 229–30 (5th Cir. 1999) ("*Lake Charles*"), *cert. denied*, 529 U.S. 1130 (2000); and 2 *Benedict on Admiralty* § 40 (7th ed. 1997)). The district court applied this general rule, stating that

> [w]hile a subcontractor may "provide" necessaries to the vessel, its counterparty is the contractor, not any of the parties authorized by Section 31341(a) to encumber the vessel. *See Lake Charles*, 199 F.3d at 230 (explaining that the "nature of the relationship

23

between each pair of entities" determines whether a party provides necessaries "on the order" of the vessel).

*Clearlake*, 239 F.Supp.3d at 685 (footnote omitted).

1. *The Exception to the General Rule*

There is, however, an exception to the general rule: "The sole exception to the rule against the subcontractor lien will occur where the subcontractor has been engaged by a general contractor in circumstances *where the general contractor was acting as an agent at the direction of the owner to engage specific subcontractors*," *Farwest Steel Corp. v. Barge Sea-Span 241*, 828 F.2d 522, 526 (9th Cir. 1987) ("*Farwest*") (emphasis added), *cert. denied*, 485 U.S. 1034 (1988), *i.e.*, where "an entity authorized to bind the ship *controlled the selection* of the subcontractor and/or its performance," *Lake Charles*, 199 F.3d at 229 (emphasis added). *See, e.g.*, *Port of Portland v. M/V PARALLA*, 892 F.2d 825, 828 (9th Cir. 1989) ("*Port of Portland*") (the subcontractor may be entitled to a lien "if the owner has ordered the general contractor to retain that subcontractor"). Thus, under this "minimal exception," *Cianbro Corp. v. George H. Dean, Inc.*, 596 F.3d 10, 17 (1st Cir. 2010) ("*Cianbro*"), a subcontractor is not entitled to assert a maritime lien "unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance," *id*. (internal quotation marks

24

omitted); *Valero Marketing & Supply Co. v. M/V ALMI SUN*, 893 F.3d 290, 293 (5th Cir. 2018) ("*Valero*") (internal quotation marks omitted). The "exception to th[e] general rule . . . applies when the vessel owner directs the general contractor to use a particular subcontractor." *Bunker Holdings Ltd. v. Yang Ming Liberia Corp.*, 906 F.3d 843, 846 (9th Cir. 2018) ("*Yang Ming*").

The subcontractor exception does not apply where there is no significant evidence "that the owner intended that [the physical supplier] be engaged as a subcontractor," *Farwest*, 828 F.2d at 526. The owner/charterer's mere awareness of a particular subcontractor does not show that the vessel controlled or directed the subcontractor's selection or intended to do so. *See, e.g.*, *Valero*, 893 F.3d at 295; *Cianbro*, 596 F.3d at 17–18. Mere knowledge that a particular subcontractor will be used "has never been held to be sufficient to establish a lien." *Port of Portland*, 892 F.2d at 828 (citing *Farwest*, 828 F.2d at 526).

In *Temara*, citing, *inter alia*, *Lake Charles*, 199 F.3d at 229; *Cianbro*, 596 F.3d at 17; and *Port of Portland*, 892 F.2d at 828, we stated the "long-recognized rule that the services of an independent subcontractor *generally* do not give rise to a maritime li[en]" and noted the exception for a subcontractor who "can . . . show[] that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its

performance," 892 F.3d at 521 (internal quotation marks and brackets omitted) (emphasis ours); *see also id*. at 522 n.7 (no subcontractor maritime lien "without any indication that a statutorily-authorized entity provided direction").  We referred to the subcontractor exception again several times in other recent decisions in the O.W. Bunker Group related appeals, while noting that the evidence in their respective records was insufficient to trigger the exception. *See, e.g., O'Rourke*, 730 F. App'x at 91 ("O'Rourke did not supply the bunkers upon the order of a statutorily authorized person, thus failing to meet CIMLA's third requirement for a maritime lien. . . . *Nor did it adduce evidence that a statutorily authorized person controlled the selection* of O'Rourke as the physical supplier." (emphasis added)); *Aegean*, 730 F. App'x at 89 ("Nor did [Aegean] adduce evidence that a statutorily authorized person *controlled the selection* of Aegean as the physical supplier." (emphasis added)); *Chemoil*, 2018 WL 3359609, at *2 ("*no*[] . . . *evidence* that a statutorily authorized person *controlled the selection* of Chemoil as the physical supplier" (emphases added)).

As is evident from the above statements of the requirements for application of the subcontractor exception, the exception is rooted in the same concerns that are reflected in the elements set out in CIMLA:  For the exception to apply so as to afford the subcontractor a lien on the vessel, there must have been (a)

an order or direction (b) by the owner/charterer of the vessel or its authorized agent, that the particular subcontractor be used. "[T]he mere fact that an entity [who is given that order or direction] is a general contractor will not preclude it from being an agent under proper circumstances." *Port of Portland*, 892 F.2d at 828. "In th[e] scenario" in which "the vessel owner directs the general contractor to use a particular subcontractor," "the general contractor essentially acts as the owner's agent and thus exercises authority to bind the vessel." *Yang Ming*, 906 F.3d at 846. As to the provision of necessaries, proper application of the subcontractor exception is thus within the scope of CIMLA.

2. *The Record in the Present Cases Involving USOT*

The district court in the present cases adverted to the subcontractor exception, *see Clearlake*, 239 F.Supp.3d at 687 ("[a]n owner can still become responsible for the services of a subcontractor, if the owner has ordered the general contractor to retain that subcontractor" (quoting *Port of Portland*, 892 F.2d at 828)), but concluded that the exception was not applicable. We note that in *Clearlake*, the district court was addressing four test cases and dealing with maritime-lien claims asserted by two physical suppliers—USOT in the cases that are the subject of the present appeals, and NuStar Energy Services, Inc. ("NuStar") in the other two cases—and in some critical

27

instances the court made findings collectively with respect to "the Vessel Interests" and "the Physical Suppliers," 239 F.Supp.3d at 688–90, without distinguishing among the various owner/charterers or between USOT and NuStar. We consider here only the record that was created in the USOT cases.

Insofar as concerns USOT, the court viewed the record as showing

- that USOT "d[id] not argue that the [Hapag] contracts required O.W. to use [USOT] as supplier[]," *id*. at 688 n.11;

- that there was "no evidence that the Vessel Interests required O.W. to use [USOT] to satisfy its obligations," *id*. at 688;

- that, although "aware of [USOT's] identit[y]," Hapag only "*tacitly* 'selected' [USOT]," *id*. at 688 n.11 (emphasis added);

- that "the *undisputed* evidence" was "that the Vessel Interests did not require O.W. to use [USOT]," *id*. at 690 (emphasis added);

- that there was "uncontradicted" evidence that Hapag viewed "the choice of physical supplier as essentially O.W.'s to make," *id*. at 688;

- that Hapag "w[as] indifferent to the identity of the supplier[]," *id*.;

- that "[*a*]*t best*," Hapag "viewed . . . USOT as "acceptable," *id*. (emphasis added); and

- that "the inclusion of [USOT] on the confirmations provided by . . . [Hapag] d[id] not amount to a 'selection' by the Vessel Interests of . . . USOT," *id*.

28

Although in the two companion appeals being decided today we agree that the district court correctly viewed the records in the NuStar cases as not warranting application of the subcontractor exception, *see* Clearlake Shipping PTE Ltd. v. NuStar Energy Services, Inc., No. 17-1458 (2d Cir. Dec. 19, 2018), and Nippon Kaisha Line Ltd. v. NuStar Energy Services, Inc., No. 17-1378 (2d Cir. Dec. 19, 2018), we do not share the above view of the record in the instant cases involving USOT.

First, USOT did argue that the Hapag purchase orders to O.W. Germany required O.W. Germany to use USOT as the physical supplier. USOT directly "[*d*]enie[*d*]" O.W. Germany's assertion that "*Hapag did not instruct OW Germany . . . to use USOT . . .* for the supply of bunker fuel to [the relevant] vessels . . . and did not control the selection of a physical supplier." (USOT's Response to OWG's Rule 56.1 Statement ¶ 19 (emphases added).) USOT added—to this response as well as others—that the

> undisputed record shows that *Hapag, as the Vessels' owner or charterer*, analyzed and compared the price and quality of the bunkers offered by USOT with the price and quality offered by other suppliers, and then *selected USOT to deliver the bunkers to Hapag's Vessels.* . . . Hapag specifically named USOT as the supplier of the bunkers on its . . . purchase orders, which Hapag prepared well *before* each delivery.

29

(USOT's Response to OWG's Rule 56.1 Statement ¶ 19 (first emphasis added; second and third emphases in original); *id*. ¶¶ 14, 20; USOT's Response to Hapag's Rule 56.1 Counter-Statement ¶¶ 186, 191, 193, 197, 198, 200, 204, 211, 212, 214, 231, 232.)

Second, viewing the record in the light most favorable to USOT as the party against which summary judgment was granted, we cannot agree that it shows as a matter of law that when Hapag decided to award the bunkers contracts to O.W. Germany, Hapag was "indifferent" to who would be the physical supplier and merely "tacitly" accepted USOT as a name of which it was merely "aware" because it had been introduced by O.W. Germany in the initial bidding. The notion that Hapag did not care who supplied the fuel—although cultivated in the deposition testimony of Hapag's fuel purchasing director Norbert Kock who stated that it was "not [Hapag's] business" to "care about what happened downstream of O.W. Germany in terms of dealing with subcontractors, physical suppliers" (Deposition of Norbert Kock at 138)—is belied by, *inter alia*, Kock's sworn declarations, twice pointing out the importance of fuel quality to a ship's performance (*see* Declaration of Norbert Kock dated June 15, 2016, ¶ 13; Declaration of Norbert Kock dated July 27, 2015, ¶ 5).

Third, the record contradicts the views that Hapag's selection of USOT as physical supplier was only "tacit[]," that there was "no evidence" of Hapag's

directing O.W. Germany to use USOT as the physical supplier, and that there was "undisputed" evidence that Hapag did not so direct. To begin with, as shown in Part I.A. above quoting exhibits to Hapag's Interpleader Complaint, each of the Hapag purchase orders themselves expressly listed USOT—and only USOT—as the "SUPPLIER." In addition, O.W. Germany, in its responding sales confirmations likewise listed USOT and only USOT as the physical supplier. While the sales confirmations standing alone would not suffice to permit a conclusion that the selection of USOT had been ordered or directed by Hapag, they provide support for a conclusion that the language in Hapag's purchase orders, listing USOT and only USOT, evinced an instruction.

Finally, USOT in its Rule 56.1 Statement asserted that Hapag, in issuing purchase orders that listed USOT and only USOT as the supplier for the four Vessels, "expressly confirm[ed]" that USOT was to be the physical supplier. Hapag disputed the characterization, stating that it "denies its purchase order 'confirms' that USOT will act as the 'supplier'"; however, in each response, Hapag also said "Hapag admits that its purchase order lists the identity of USOT as the physical supplier." (Hapag's Response to USOT's Rule 56.1 Statement ¶ 38 (re SANTA ROBERTA), ¶ 71 (re VIENNA EXPRESS), ¶ 102 (re SEASPAN HAMBURG), ¶ 133 (re SOFIA EXPRESS)).

31

Without more, Hapag's listing of USOT in the purchase orders could perhaps have been viewed as merely suggestive. But in each of those same Rule 56.1 responses as to the meaning of its purchase orders, Hapag went on to state that

> O.W. Germany was *permitted* . . . to find a substitute fuel of similar specifications and price *if* USOT was unable to act as the physical supplier.

(Emphases added.) The plain syntactical implication of this statement by Hapag is that unless USOT was unable to perform, O.W. Germany's use of a physical supplier other than USOT was not permitted.

We see nothing in the record to compel the conclusion that Hapag did not control the selection of the physical supplier; and Hapag's own admissions may permit a conclusion that it instructed O.W. Germany to use USOT as the physical supplier unless USOT could not perform.


CONCLUSION


We have considered all of the parties' arguments on these appeals and, except to the extent indicated above, have found them to be without merit. For the reasons stated, we affirm the district court judgment insofar as it concluded that

32

USOT did not adduce evidence that it was ordered to provide the bunkers by Hapag or by an agent authorized by Hapag to order bunkers. We further affirm the district court's conclusion that maritime liens cannot properly be conferred on the basis of equitable principles such as unjust enrichment. We vacate and remand the district court judgment on the issue of whether Hapag directed that USOT be the physical supplier pursuant to the exception to the subcontractor rule.